[No. 52911-1-I.   Division One.   June 6, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES WALTER WEBER, *Appellant*.

---

880

*Charles Walter Weber*, pro se.

*David L. Donnan* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Sara L. Mc-Culloch* and *Amy R. Holt, Deputies*, for respondent.

¶1 APPELWICK, J. — A jury convicted Charles Weber of second degree attempted murder and first degree assault, both while armed with a firearm, and first degree unlawful possession of a firearm. The trial court vacated the assault conviction based on double jeopardy. Weber argues for reversal based on use of juvenile adjudications in sentencing without findings by the jury, prosecutorial misconduct, ineffective assistance of counsel, violation of Fourth Amendment rights, and jury instructional error.

¶2 The State cross-appeals that the trial court should have instead vacated Weber's attempted murder conviction

as a remedy for double jeopardy, because the vacated assault conviction carried the longer standard range. The State also argues that the trial court erred in excluding one of Weber's prior juvenile adjudications in calculating his offender score because it "washed out" under a prior version of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW.

¶3 We reverse the vacation of the assault conviction and vacate the conviction for attempted murder. We hold that prior juvenile adjudications are entitled to be considered by the trial court at sentencing in the same manner as prior adult convictions. We reverse the exclusion of the juvenile adjudication in calculating Weber's offender score. We affirm on the remaining issues. We remand for resentencing.

*FACTS*

¶4 On March 18, 2003, Gabriel Manzo-Vasquez (Manzo), Nick Renion, and Charles Weber were hanging out and drinking beer at their friend Rhonda Encina's apartment. Manzo had met Weber once before at Encina's apartment and knew Weber as "Guero Loco," meaning "crazy white guy." Renion took Manzo's beer and an argument ensued. Renion tried to make Manzo go outside and fight. Manzo refused. Weber threatened Manzo by pointing a gun at Manzo's stomach. Manzo fled out of a bedroom window. Weber chased Manzo and shot at him as he ran to his car. Many bullets struck Manzo's car as he drove away. One grazed his stomach causing slight injury.

¶5 Manzo told the police that "Guero Loco" shot at him. He provided the police with Weber's physical description, including a large distinctive tattoo of "206" on the back of his neck and his nickname. Manzo identified Weber and Renion from photo montages. He identified Weber with 80 percent certainty, and indicated he could be 100 percent certain if he could see the tattoos that had been blocked out on the photos. Weber has the letters L-O-C-O tattooed across his knuckles, a large "206" on his neck, and "Wedo

Loco" in cursive on his neck. At trial Manzo identified Weber as the shooter and confirmed that Weber had the same tattoos he had seen before.

¶6 Prior to trial, the court granted a defense motion to "exclude any reference to gang-related membership or any kind of supposed expert testimony with respect to [gangs]." The court also excluded testimony by Detective Alvarez that he had previously met Weber during a criminal investigation of Weber's brother, stating that any relevance of this evidence was unclear but that its prejudice was clear. The court did not exclude the fact that Detective Alvarez had previous contact with Weber.

¶7 The State concedes that the prosecutor committed prosecutorial misconduct during Weber's trial. The prosecutor elicited testimony from Detective Alvarez on evidence the trial court excluded in pretrial motions. In addition, the prosecutor made an improper rebuttal closing argument.

¶8 Weber was charged with first degree attempted murder, first degree assault, first degree unlawful possession of a firearm, and delivery of cocaine. The jury convicted Weber of the lesser included offense of second degree attempted murder. The jury also convicted Weber of first degree assault. The jury found that Weber was armed with a firearm at the time he committed both these offenses. The jury also convicted Weber of unlawful possession of a firearm in the first degree. Weber pleaded guilty to possession of cocaine with intent to deliver.

¶9 At sentencing, the trial court calculated Weber's offender score after excluding one of his prior juvenile adjudications from consideration. The trial court concluded that this juvenile adjudication washed out under a previous version of the SRA. The trial court then vacated the first degree assault conviction to remedy the double jeopardy violation that would result if both the assault and attempted murder convictions were upheld. The trial court sentenced Weber based on the second degree attempted murder count to a total of 290 months (230 months plus the 60-month firearm enhancement). The shorter sentences for

the unlawful possession of a firearm and the drug offense would run concurrently. As part of the requirements of the judgment and sentence, Weber was ordered to provide a biological sample for DNA (deoxyribonucleic acid) identification.

## DISCUSSION

1. Double Jeopardy: Which Offense to Strike

■ ¶10 The double jeopardy clauses of the fifth amendment of the United States Constitution and article I, section 9 of the Washington Constitution prohibit multiple punishments for the same offense. *State v. Calle*, 125 Wn.2d 769, 888 P.2d 155 (1995); *State v. Maxfield*, 125 Wn.2d 378, 886 P.2d 123 (1994). The State concedes that the attempted murder and assault convictions obtained in this case constitute double jeopardy.

■ ■ ¶11 Weber argues that his protection against double jeopardy was violated when the judge allowed both the attempted murder charge and the assault charge to proceed to trial, after noting that convictions on both would violate double jeopardy. In *Ball v. United States*, 470 U.S. 856, 859, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985), the United States Supreme Court held that the government has "broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case." *Ball*, 470 U.S. at 859. In *Ohio v. Johnson*, the United States Supreme Court "held that even where the [Double Jeopardy] Clause bars cumulative punishment for a group of offenses, 'the Clause does not prohibit the State from prosecuting [the defendant] for such multiple offenses in a single prosecution.'" *Ball*, 470 U.S. at 860 n.7 (second alteration in original) (quoting *Ohio v. Johnson*, 467 U.S. 493, 500, 104 S. Ct. 2536, 81 L. Ed. 2d 425 (1984)); *see also Calle*, 125 Wn.2d at 777 n.3. If sufficient proof supports both counts, the State is entitled to charge both counts. *Ball*, 470 U.S. at 865; *Calle*, 125 Wn.2d at 777 n.3. Therefore, Weber's argument fails.

■■ ¶12 The question is whether Weber received multiple punishments. The remedy for convictions on two counts that together violate the protection against double jeopardy is to vacate the conviction on the lesser offense. *In re Pers. Restraint of Burchfield*, 111 Wn. App. 892, 899, 46 P.3d 840 (2002); *Ball*, 470 U.S. at 865. Therefore, the double jeopardy violation is remedied by vacating either of the two counts. Here, the trial court vacated Weber's assault conviction. Therefore, Weber faces no double jeopardy violation.

¶13 However, by cross-appeal, the State argues that the trial court erred in vacating the first degree assault conviction as the "lesser" offense because it carried a higher standard range than the attempted second degree murder conviction. The State urges that the trial court should have vacated the second degree attempted murder conviction instead as the lesser offense.

¶14 The trial court considered several factors to determine which was the lesser offense: the standard sentence range, the classification and seriousness level of the crime under the SRA, and the mens rea of the underlying convictions. The trial court noted that although the standard range for first degree assault was higher than the standard range for second degree attempted murder, they were not significantly different (approximately 10 months separated the high and low ends). Second degree murder was classified as seriousness level 14, and first degree assault as level 12. The court also stressed that the intent to cause death in the second degree attempted murder charge was much more serious than the intent to inflict great bodily harm required for assault.

¶15 In *Burchfield*, this court vacated a first degree manslaughter conviction as the less serious offense than assault "[b]ecause first degree manslaughter as charged [in *Burchfield*] is a lesser class of felony, assigned a lower seriousness level, and has a lower standard sentencing range than assault." *Burchfield*, 111 Wn. App. at 900. The court noted it would be atypical to find that the offense with

a shorter standard range is the "more serious" offense. *Burchfield*, 111 Wn. App. at 900. However, although the court's discussion in *Burchfield* centered on the length of the sentence, it did not explicitly hold that in all cases the crime with the longer sentence is the greater offense for double jeopardy purposes. Rather, all three factors in *Burchfield* (standard sentence range, seriousness level, and class of felony) pointed to assault as the greater offense. Therefore, although *Burchfield* supports a conclusion that the crime with the greater penalty is generally considered the greater offense, *Burchfield* is not dispositive.

¶16 Considering these three factors, as the trial court here noted, "this case is a much closer call." The class of felony factor favors neither attempted second degree murder or first degree assault as the more serious offense; both are class A felonies. RCW 9A.32.050, 9A.28.020, 9A.36.011. The standard sentence ranges for both, although close, favor assault as the more serious offense. The range is 192.75 to 267.75 months for attempted second degree murder, and 209 to 277 months for first degree assault (both using an offender score of 8 as the trial court used).

¶17 The final consideration is the seriousness level assigned by the legislature, which favors the murder conviction as the more serious offense. The seriousness of second degree murder is 14 and of first degree assault is 12. But, the sentencing guidelines do not include seriousness levels for attempted offenses, only for completed offenses. In the case of anticipatory offenses (non-VUCSA (violation of the Uniform Controlled Substances Act) attempts, conspiracies, and solicitations), the guidelines provide that the standard sentence range is 75 percent of the range for the completed offense.

¶18 In several cases the court vacated the offense with the lesser possible punishment. *See State v. Valentine*, 108 Wn. App. 24, 29, 29 P.3d 42 (2001); *State v. Read*, 100 Wn. App. 776, 778, 793, 998 P.2d 897 (2000); *State v. Portrey*, 102 Wn. App. 898, 901, 10 P.3d 481 (2000). Although in each these cases the court did vacate the offense that would

have resulted in the lower sentence range, none of them explicitly noted that the sentence range was the basis for its decision. For example, the *Valentine* court noted the longer standard sentence for the retained count, but did so in the context of discussing the exceptional sentence imposed, not in the context of explaining why it was vacating the other count. *Valentine*, 108 Wn. App. at 29. Therefore although these three cases did result in the outcome the State requests here, none of them explained the basis for choosing which crime to vacate.

¶19 The remedy for a double jeopardy violation should not create a paradoxical result or interfere with the interests of justice. *See People v. Davis*, 122 Mich. App. 597, 333 N.W.2d 99, 104 (1983). If Weber was charged with and convicted of only assault, he would have faced the longer sentence. If the two convictions did not violate double jeopardy and were ordered to run concurrently, he would have faced the longer sentence. But, by vacating the assault conviction, the trial court imposed the lesser sentence for attempted second degree murder.

¶20 Looking only to the seriousness level to determine which conviction to vacate will lead to inconsistent results. Crimes with a higher seriousness level are not necessarily those with greater penalties or of higher class of felony. The legislature has defined class A felonies as those carrying a maximum sentence for a first conviction of 20 or more years. RCW 9.94A.035(1). Class B felonies carry a first conviction maximum sentence of at least 8 years but less than 20 years, and class C felonies carry a first conviction maximum sentence of less than 8 years. RCW 9.94A.035(2), (3). However, on the SRA seriousness chart, some class B felonies have a higher seriousness level than some class A felonies. For example, arson in the first degree is a class A felony with a seriousness level of 8, and assault of a child in the second degree is a class B felony with a seriousness level of 9. RCW 9A.36.130, 9A.48.020. Therefore, seriousness levels will not always reflect the same categorization the legislature set forth in defining felony classes.

¶21 The sentence is the true indicator of the consequence for the offender and of the interests of justice. The most serious offense is the offense with the most serious consequence for the offender. The only way to consistently vacate the less serious offense is to look to the sentence to be imposed under the two offenses. We therefore hold that to remedy a double jeopardy violation presented when two convictions punish the same offense, the court must vacate the crime carrying the lesser sentence. In this case, both offenses were subject to mandatory firearm enhancements of 60 months. Thus, comparing standard sentence ranges shows that the assault conviction has a more serious consequence for Weber, making second degree attempted murder the conviction to vacate.

## 2. Use of Juvenile Criminal History in Sentencing

¶22 In *Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 2536, 159 L. Ed. 2d 403 (2004), the United States Supreme Court reiterated the rule set out in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000): " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " The *Blakely* Court clarified the meaning of "statutory maximum" for *Apprendi* purposes as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*" without finding any additional facts. *Blakely*, 542 U.S. at 303. Although the Court clarified the meaning of "statutory maximum," it expressly retained the prior conviction exception in its recitation of the *Apprendi* rule. *Blakely*, 542 U.S. at 301.

¶23 Weber argues that the prior conviction exception has been eroded and that prior convictions should therefore be included in the facts a jury must find under *Blakely*. The Washington Supreme Court has already considered and rejected this argument. In *State v. Hughes*, 154 Wn.2d 118, 134, ¶29, 110 P.3d 192 (2005), the court held

that *"Blakely* left intact the validity of exceptional sentences based on prior convictions." Thus, under the exception for prior convictions, Weber's prior adult convictions were properly considered to calculate his offender score. His offender score was then properly used to increase his standard range for the current crimes. The *Blakely* decision does not require a contrary result.

¶24 Weber argues that even if the *Apprendi* exception for prior convictions remains valid, it does not extend to prior juvenile adjudications. The State argues that a lack of a jury trial at the juvenile adjudication does not distinguish a juvenile adjudication from an adult conviction for purposes of the *Apprendi* exception.

¶25 Weber cites *United States v. Tighe*, 266 F.3d 1187 (9th Cir. 2001). In *Tighe*, the Ninth Circuit held that juvenile adjudications do not fit into the narrow *Apprendi* exception for prior convictions because they are not "subject to the fundamental triumvirate of procedural protections intended to guarantee the reliability of criminal convictions: fair notice, reasonable doubt and the right to a jury trial." *Tighe*, 266 F.3d at 1193 (citing *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999)). The *Tighe* court noted that the *Apprendi* Court's continued adherence to the prior conviction exception was "premised on sentence-enhancing prior convictions being the product of proceedings that afford crucial procedural protections—particularly the right to a jury trial and proof beyond a reasonable doubt." *Tighe*, 266 F.3d at 1194. Thus, the *Tighe* court concluded that the " 'prior conviction' exception to *Apprendi*'s general rule must be limited to prior convictions that were themselves obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt." *Tighe*, 266 F.3d at 1194.

¶26 The dissent in *Tighe* countered that:

[W]here a juvenile received all the process constitutionally due at the delinquency proceeding stage, we found the later use of the juvenile adjudication for an adult enhancement to be constitutionally sound because "the conviction was constitu-

tionally valid for purposes of imposing a sentence of imprisonment for the [juvenile] offense itself." To hold otherwise would have required the court "to hold that the enhancement of an adult criminal sentence requires a higher level of due process protection than the imposition of a juvenile sentence"—a notion the court squarely rejected.

*Tighe*, 266 F.3d at 1198-99 (Brunetti, J., dissenting) (second alteration in original) (quoting *United States v. Williams*, 891 F.2d 212, 215 (9th Cir. 1989)). The *Tighe* dissent argued that the majority's reliance on *Jones* was flawed. *Tighe*, 266 F.3d at 1200 (Brunetti, J., dissenting). Rather than reading *Jones* to require that the right to jury trial attach to a prior juvenile adjudication before it fit into the *Apprendi* prior conviction exception, the *Tighe* dissent argued that:

> [T]he language in *Jones* stands for the basic proposition that Congress has the constitutional power to treat prior convictions as sentencing factors subject to a lesser standard of proof because the defendant presumably received all the process that was due when he was convicted of the predicate crime. For adults, this would indeed include the right to a jury trial. For juveniles, it does not.

*Tighe*, 266 F.3d at 1200 (Brunetti, J., dissenting). The *Tighe* dissent concluded that extending this "logic to juvenile adjudications, when a juvenile receives all the process constitutionally due at the juvenile stage, there is no *constitutional* problem (on which *Apprendi* focused) in using that adjudication to support a later sentencing enhancement." *Tighe*, 266 F.3d at 1200 (Brunetti, J., dissenting).

¶27 Juveniles have no right to a jury trial under either the Washington State or the federal constitution. *State v. Schaaf*, 109 Wn.2d 1, 16, 743 P.2d 240 (1987); *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971). A juvenile does have the due process protection of proof beyond a reasonable doubt and the rights to counsel, to notice of the charges, to confront and cross-examine witnesses, and against self-incrimination. *In re Winship*, 397 U.S. 358, 368, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

These protections ensure the accuracy of the fact-finding proceedings without the need for a jury. *McKeiver*, 403 U.S. at 543. The Washington courts agree that a juvenile does not have the right to a jury determination at an adjudicative hearing. *Schaaf*, 109 Wn.2d at 16. The punitive purpose of adult criminal proceedings is inapposite to the dual purposes of juvenile adjudications: accountability and rehabilitation. *Schaaf*, 109 Wn.2d at 4.

¶28 The *Apprendi* Court upheld the exception for prior convictions based on the status of recidivism as a " 'traditional, if not the most traditional' " factor considered by a sentencing court in increasing a sentence. *Apprendi*, 530 U.S. at 488 (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 243, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998)). "[R]ecidivism 'does not relate to the commission of the offense' " itself; it is an offender-related fact. *Apprendi*, 530 U.S. at 488 (quoting *Almendarez-Torres*, 523 U.S. at 244). The *Apprendi* Court continued that:

> Both the certainty that procedural safeguards attached to any "fact" of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that "fact" in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a "fact" increasing punishment beyond the maximum of the statutory range.

■ ¶29 The *Apprendi* Court's concerns with procedural safeguards require a reliable fact-finding proceeding. Under *McKeiver* and *Schaaf*, in the juvenile context a reliable fact-finding proceeding does not necessitate the right to a jury trial. Therefore, the State argues that the *Tighe* court's requirement of a jury trial prior to application of the prior conviction exception is flawed in that it implied that nonjury juvenile adjudications are inherently unreliable. Given the federal and Washington State cases holding that jury fact finding is not required to ensure accuracy in juvenile adjudications, we do not think the *Tighe* court's implication is well founded.

¶30 The State cites *United States v. Smalley*, 294 F.3d 1030 (8th Cir. 2002), *cert. denied*, 537 U.S. 1114 (2003), as

an example of one of several cases holding that juvenile adjudications fall within the *Apprendi* "prior conviction" exception. The *Smalley* court agreed with the *Tighe* dissent and concluded that the language in *Jones*, rather than requiring a jury trial in all proceedings under the *Apprendi* exception, required that the necessary constitutional safeguards be provided in prior proceedings. *Smalley*, 294 F.3d at 1032. The *Smalley* court held, as the State urges, that "juvenile adjudications, like adult convictions, are so reliable that due process of law is not offended by such an exemption." *Smalley*, 294 F.3d at 1033. Procedural safeguards in juvenile adjudications are "more than sufficient to ensure the reliability that *Apprendi* requires," and juvenile adjudications can be characterized as prior convictions for the *Apprendi* exception. *Smalley*, 294 F.3d at 1033.

¶31 Weber does not argue that juvenile adjudications are unconstitutional for failing to provide the right to a jury trial, and such an argument would be difficult under *McKeiver* and *Schaaf*. Weber also does not argue that it is improper or unconstitutional per se to use the fact of a prior juvenile adjudication to increase an adult sentence. Weber argues only that because a jury trial was not provided at the juvenile proceeding, the fact of the prior adjudication must now be determined by a jury prior to being used to increase his sentence. However, as the State notes, "requiring a jury to make the determination that an unreliable juvenile adjudication exists does nothing to cure the perceived unreliability of the non-jury adjudication."

¶32 We agree with the *Smalley* court and disagree with the *Tighe* court. We hold that juvenile adjudications that meet constitutionally-required safeguards fall within the prior conviction exception set out in *Almendarez-Torres* and upheld in *Apprendi* and *Blakely*. *See also State v. Hitt*, 273 Kan. 224, 42 P.3d 732, 740 (2002) (disagreeing with *Tighe* and holding that the *Apprendi* exception for prior convictions encompasses juvenile adjudications); *People v. Lee*, 111 Cal. App. 4th 1310, 4 Cal. Rptr. 3d 642, 647 (2003). Weber does not contest the fact of his prior juvenile adju-

dications. Under the exception for prior convictions, Weber's prior juvenile adjudications are properly considered to calculate his offender score.

¶33 The remainder of this opinion lacks precedential value and will not be published in the Washington Appellate Reports but will be filed of public record in accord with RCW 2.06.040.

ELLINGTON, A.C.J., and AGID, J., concur.

Review granted at 156 Wn.2d 1010 (2006).