156 P.3d 281 (2007)
STATE of Washington, Respondent,
v.
Ali ELMI, Appellant.
No. 56460-9-I.
Court of Appeals of Washington, Division 1.
April 23, 2007.
*283 David L. Donnan, Susan F. Wilk, Oliver Ross Davis, Seattle, for Appellant.
Lee Davis Yates, King County Prosecutor's Office, Seattle, for Respondent
COLEMAN, J.
¶ 1 Moments after Fadumo Aden looked out a living room window and saw her estranged husband, Ali Elmi, standing outside, Elmi fired three bullets into the living room, narrowly missing Aden and three young children. Elmi appeals his conviction for the attempted murder of Aden, arguing that there was insufficient evidence of intent to kill and premeditation. He also appeals his convictions for assaulting the children, arguing that the State failed to prove the requisite statutory and common law intent for those assaults and that the convictions violate his right to a unanimous verdict.
¶ 2 Because there was sufficient evidence of intent to kill and premeditation, we affirm Elmi's conviction for attempted murder. And because Elmi's intent toward Aden transferred to the children either by operation of the assault statute or the doctrine of transferred intent, we affirm his convictions for the assaults against the children. The conviction for assaulting Aden, however, violates double jeopardy and must be vacated.

FACTS
¶ 3 Fadumo Aden and Ali Elmi separated during the Spring of 2002. On the afternoon of May 18, 2002, they had a "very heated" argument over the phone. Aden testified that Elmi called her a "bitch" and a "slut" during the argument and that she abruptly hung up on him.[1]
¶ 4 After the argument, Aden drove to her mother's house. Around 10 p.m., Aden and her three-year-old son, three-year-old brother, and five-year-old sister were watching television in her mother's living room when she heard arguing outside. She briefly parted the curtains and saw several people trying to hold Elmi back. Moments later, she heard gunshots and the sound of breaking glass. She screamed and moved the children to the kitchen, where she called 911.
¶ 5 Police later found three bullet holes in the living room window. They also found bullet holes in the curtains, the television screen, and a kitchen cabinet. Four shell casings were found outside the house within five to ten feet of the window. Although Aden testified that she did not see the faces of the people in the yard, she told the 911 operator that Elmi was the person being restrained in the yard just before the shooting.
¶ 6 The 911 tape, which was played for the jury, begins with the sound of children screaming and an hysterical Aden pleading for help. Aden repeatedly tells the operator that shots have been fired and that windows have been broken. Aden says that she does not know whether Elmi is still outside, that she has locked the door, and that she does not want to go near the window. There are intermittent sounds of distress from the children throughout the recording. At one point, a child can be heard saying, "He's going to kill my mommy."
*284 ¶ 7 Based on these facts and other evidence linking Elmi to the gun used in the shooting, the State charged him with attempted first degree murder and four counts of first degree assault with a deadly weapon-one count for assaulting Aden and three counts for assaulting the children.
¶ 8 The children did not testify at trial. When asked how the children reacted to the shooting, Aden testified:
I mean, I screamed and they reacted to how I reacted, but you couldn't really  I don't know how they identified it with shots, really, but they reacted to my reaction, which was, oh, my God, let's move and go to another room.
. . . .
It was, I think, a little fast and I freaked out, so, I mean, they were all young and didn't know what gunshots were, so I think it was my reaction that had them freaked out.
Report of Proceedings (April 14, 2005) at 60. Aden did not specify at what point she removed the children from the room, but testified that it may have been during, rather than after, the shooting.
¶ 9 The court instructed the jury regarding the three common law forms of assault  battery, attempted battery, and placing another in reasonable apprehension of harm. The court also instructed the jury on transferred intent. The jury convicted Elmi as charged. The court merged the convictions for the attempted murder and assault of Aden but did not vacate either conviction.

ANALYSIS

I.
¶ 10 Elmi first contends that his attempted murder conviction is not supported by sufficient evidence. Evidence is sufficient if, after reviewing it in the light most favorable to the State, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). A sufficiency claim admits the truth of the State's evidence and all inferences that can reasonably be drawn therefrom. Salinas, 119 Wash.2d at 201, 829 P.2d 1068. Intent may be inferred from conduct, State v. Varga, 151 Wash.2d 179, 201, 86 P.3d 139 (2004), and this court must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence. State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533 (1992).
¶ 11 The crime of attempted murder requires specific intent to cause the death of another person. State v. Dunbar, 117 Wash.2d 587, 590, 817 P.2d 1360 (1991). Elmi asserts there was insufficient evidence for the jury to find that he intended to kill Aden. He argues that "[w]ithout evidence of some unusually serious prior altercation or a threat to kill, [there] was insufficient evidence of intent to kill [Aden.]" Brief of Appellant, at 17.
¶ 12 But it is not necessary for the State to show that Elmi verbalized or acted out his intent beforehand. See State v. Gallo, 20 Wash.App. 717, 729, 582 P.2d 558 (1978). Rather, intent to kill may be inferred from all the circumstances surrounding the event. Gallo, 20 Wash.App. at 729, 582 P.2d 558. Proof that a defendant fired a weapon at a victim is a sufficient basis for finding an intent to kill. State v. Hoffman, 116 Wash.2d 51, 84-85, 804 P.2d 577 (1991) ("Proof that a defendant fired a weapon at a victim is, of course, sufficient to justify a finding of intent to kill."). Viewed in a light most favorable to the State, the location and number of the bullet holes, the timing of the shots in relation to Aden's appearance at the window, the proximity of the shell casings to the living room window, and the heated argument earlier in the day strongly support an inference of intent to kill.
¶ 13 Elmi also argues that there was insufficient evidence of premeditation. This argument is meritless. Premeditation is "the deliberate formation of and reflection upon the intent to take a human life." State v. Robtoy, 98 Wash.2d 30, 43, 653 P.2d 284 (1982). It involves some degree of thinking beforehand and "`weighing or reasoning for a period of time, however short.'" State v. Ollens, 107 Wash.2d 848, 850, 733 P.2d 984 (1987) (quoting State v. Brooks, 97 Wash.2d *285 873, 876, 651 P.2d 217 (1982)). While premeditation cannot be inferred from intent to kill, State v. Commodore, 38 Wash.App. 244, 247, 684 P.2d 1364 (1984), it can be inferred from circumstantial evidence, including evidence of motive, procurement of a weapon, stealth, and the method of killing. State v. Gentry, 125 Wash.2d 570, 598-99, 888 P.2d 1105 (1995); State v. Ortiz, 119 Wash.2d 294, 312, 831 P.2d 1060 (1992). In this case, the protection order, the heated argument, the transportation of a weapon to the scene, the evidence of people attempting to restrain the shooter, and the number of shots provide sufficient evidence for a rational trier of fact to find premeditation beyond a reasonable doubt.

II.
¶ 14 Elmi next contends that instructing the jury on transferred intent improperly relieved the State of its burden of proving certain elements of the first degree assaults against the children.[2] We disagree.
¶ 15 To prove the assaults against the children, the State had to prove both the statutory mens rea of intent to inflict great bodily harm and the mental state for the applicable common law means of committing assault  intent to inflict bodily injury or intent to create apprehension of harm.[3] Because there was no evidence that Elmi knew the children were in the living room with Aden or that he intended to harm them, the State sought to satisfy the intent elements for the assaults against the children via transferred intent. Whether and how intent could be transferred in this case is largely controlled by State v. Wilson, 125 Wash.2d 212, 218, 883 P.2d 320 (1994).
¶ 16 In Wilson, the defendant fired three bullets through a tavern window. Two of the bullets hit unintended victims and resulted in convictions for first degree assault. The issue before the Wilson court was whether, under the first degree assault statute, "an intent to inflict great bodily harm upon an intended victim transfers to an unintended victim." Wilson, 125 Wash.2d at 216, 883 P.2d 320. The court held that transferred intent is unnecessary when a statute does not require that intent match a specific victim. When intent must match a specific victim, the doctrine of transferred intent may transfer intent from intended to unintended victims. Wilson, 125 Wash.2d at 219, 883 P.2d 320. Noting that the first degree assault statute requires specific intent to inflict great bodily harm but does not require that such intent match a specific victim, the Wilson court concluded that Wilson's intent toward his intended victim transferred to his unintended victims by operation of the statute. Although the court did not expressly address the statute's effect on the common law layer of intent, it implicitly did so by stating, "Reading the various assault statutes, in combination with the common law definitions for assault, we are persuaded that Wilson assaulted [the unintended victims] when . . . [he] discharged bullets from a firearm into the [unintended victims.]" Wilson, 125 Wash.2d at 218, 883 P.2d 320 (emphasis added).[4]
¶ 17 Applying Wilson here, the statutory intent for Elmi's assault against Aden, i.e., intent to inflict great bodily harm, did not have to match a specific victim; therefore, proof of Elmi's intent as to Aden satisfied the statutory intent element for the assaults against Aden and the children.
¶ 18 The same is true of the two applicable common law mental states. The mental state for the reasonable apprehension form of assault is intent to create apprehension of harm. The instruction defining the *286 reasonable apprehension form of assault stated:
An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.
Instruction 17 (emphasis added). This form of assault does not require that the intended victim and the person who suffered the assault be the same person. Because Elmi's common law intent did not have to match a specific victim, his intent to cause Aden apprehension of harm automatically transferred to the assaults against the children.[5] Therefore, it was unnecessary for the jury to resort to the doctrine of transferred intent as to that form of assault.
¶ 19 We reach the same conclusion regarding the attempted battery form of assault. Instruction 17 defined that form of assault as follows:
An assault is also an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
. . . .
Nothing in this definition requires that the intended victim and the actual victim be the same person. We see no reason why Wilson's reasoning and holding as to first degree assault committed by the battery form of assault would not apply equally to first degree assaults committed by attempted battery.
¶ 20 But even if we were to conclude otherwise, we would still affirm based on the doctrine of transferred intent. As noted above, that doctrine applies when intent must match a specific victim. Wilson, 125 Wash.2d at 219, 883 P.2d 320. Elmi argues that the doctrine should not apply when unintended victims suffer no injury or the defendant is unaware of their presence. We disagree and instead concur with the Massachusetts Supreme Court's reasoning in Commonwealth v. Melton, 436 Mass. 291, 763 N.E.2d 1092 (2002).
We recognize that, in most of the cases cited above, the unintended victims were actually struck, injured, or killed by the defendant. That fact, however, has nothing to do with intent or with transferred intent. It merely affects whether the crime is one of assault and battery or only assault. . . .
. . . .
Beyond the metaphysics of transferred intent, we note that treating the defendant's actions as four assaults by means of a dangerous weapon is consistent with the purposes underlying the common law of assault. An attempted but unsuccessful battery is criminal not because it actually harms the victim  indeed, the victim can be completely unaware of the attempt  but rather because it imperils the victim. The conduct here (a shot into a car full of people, fired at point blank range from a passing vehicle traveling at high speed) placed four people in equally grave peril. Limiting the number of convictions to the precise number of victims the defendant intended to hit ignores the additional persons whose lives were placed at risk by the defendant's attempt to batter his intended victim. The suggestion that they were not victims of any crime, when they all suffered the very peril that the crime of assault by means of a dangerous weapon is intended to address, is contrary to common sense.
. . . . Rather, a person is a victim of assault if he is at risk of battery from the defendant's attempted battery on anyone, just as the person would be a victim of assault if he were placed in fear of battery from the defendant's intentionally threatened battery on anyone. The peril and the fear inflicted by such conduct is what makes one a victim of assault, and, as long *287 as the defendant has the requisite mens rea with regard to any person, the defendant may be convicted of as many separate assaults as there are victims.
Melton, 436 Mass. at 298-300, 763 N.E.2d 1092 (footnote omitted).
¶ 21 We also reject Elmi's argument that transferred intent should apply only if the defendant was aware of the unintended victims' presence. Courts in other jurisdictions have generally rejected such a limitation, particularly where the defendant fired a gun into a place where unintended victims were likely to be present. See, e.g., Culler v. State, 277 Ga. 717, 720, 594 S.E.2d 631 (2004):
(appellants intentionally fired bullets into a house occupied by three people. . . . When an unintended victim . . . is subjected to harm due to an unlawful act intentionally aimed at someone else . . ., the law prevents the actor from taking advantage of his own misdirected wrongful conduct and transfers the original intent from the one against whom it was intended to the one who suffered harm. Accordingly, it is of no import that appellants were unaware that [the victim] was in the home.)
(Footnotes omitted.) State v. Hough, 585 N.W.2d 393, 396-97 (Minn.1998):
(the assailant's knowledge of the presence of a particular victim is not essential to sustain a conviction under the statute. . . . When an assailant fires numerous shots from a semiautomatic weapon into a home, it may be inferred that the assailant intends to cause fear of immediate bodily harm or death to those within the home. As the trial court noted, it was a natural and probable consequence that Hough's actions would endanger people other than Mr. Staska. Such intentional behavior is not excused simply because Hough claims he did not know others were present in the home or because others within the home were not immediately aware of the dangerous act.)
State v. Mullins, 76 Ohio App.3d 633, 602 N.E.2d 769 (1992) ("the proximity of the victim and the knowledge of the perpetrator about the ultimate victim are immaterial"); State v. Carter, 84 Conn.App. 263, 268-69, 853 A.2d 565 (2004) (agreeing with Mullins).[6] We see no basis in logic or law for limiting transferred intent in the manner Elmi suggests.
¶ 22 Elmi also argues that "construction of the assault statutes to allow [transferred intent] violates the rule of lenity[.]" Supplemental Brief of Appellant, at 5. The rule of lenity could potentially apply to the analysis in Wilson since it was based on statutory construction and a "literal" reading of the statute. But this court is bound by Wilson; therefore, Elmi's lenity argument is more properly made to the Supreme Court. Furthermore, even if the rule of lenity led to a conclusion that the statutory and common law intents had to match a specific victim, that would only mean that intent could not transfer by operation of the statute. Intent could still be transferred via the doctrine of transferred intent.

III.
¶ 23 Elmi contends that his convictions for assaulting the children are not supported by sufficient evidence because the State failed to prove the common law elements of the reasonable apprehension and attempted battery forms of assault. The State initially conceded that point but has since withdrawn its concession. We conclude the evidence was sufficient for both forms of assault.
¶ 24 As to the reasonable apprehension form of assault, the State had to prove that, with specific intent to create an apprehension of imminent harm, Elmi caused the children to experience apprehension of imminent harm. Specific intent "can be inferred as a logical probability from all the facts and circumstances." Wilson, 125 Wash.2d at 217, 883 P.2d 320. While there was no direct evidence that Elmi intended to frighten Aden, there was circumstantial evidence from which the jury could have concluded as a matter of logical probability that *288 Elmi intended all of the likely results of firing a gun at her, including putting her in apprehension of harm. As discussed above, that intent transferred by statute to the assaults against the children.
¶ 25 The evidence was also sufficient for a jury to conclude that the children were put in reasonable apprehension of imminent bodily harm. It is undisputed that the children were watching television in the living room when multiple bullets came through the living room window. One of those bullets hit the television screen. Aden then screamed and ushered the children to the kitchen for their protection. Those acts clearly signaled to the children that they were in physical danger. Indeed, the 911 tape begins with the sound of children screaming. As the recording progresses, Aden hysterically and repeatedly states that shots have been fired and makes it clear that the shooter may still be outside. The children continue, intermittently, to make sounds of distress. The tape thus supports inferences that the children were either in apprehension of imminent bodily harm when they first entered the kitchen or developed such apprehension while listening to their mother's conversation with the 911 operator.
¶ 26 To prove an assault by attempted battery, the State had to prove that Elmi "inten[ded] to inflict bodily injury upon another." Instruction 17. The verdicts on the attempted murder and assault against Aden demonstrate that the jury found the common law mental state for an attempted battery, i.e., that Elmi intended to inflict bodily injury on Aden. That intent transferred to the assaults against the children.
¶ 27 In short, we conclude that both of the applicable forms of common law assault were supported by sufficient evidence.[7]

IV.
¶ 28 Elmi next argues, and the State concedes, that his convictions for the attempted murder and assault of Aden violate double jeopardy. Although the trial court found a double jeopardy violation, it did not vacate the assault conviction; instead, the court simply declined to impose punishment on that count. The parties agree that the court was required to vacate the lesser of the two offenses, i.e., the assault count involving Aden. We concur and direct the court on remand to vacate the assault conviction. State v. Weber, 127 Wash.App. 879, 884-88, 112 P.3d 1287 (2005), affirmed, 159 Wash.2d 252, 149 P.3d 646 (2006).

V.
¶ 29 Elmi argues that adding a sentence enhancement for use of a firearm in an assault with a firearm violates double jeopardy. He also contends that multiple firearm enhancements imposed for use of a single firearm violate double jeopardy. These arguments are controlled by our decisions in State v. Nguyen, 134 Wash.App. 863, 142 P.3d 1117 (2006) and State v. Huested, 118 Wash.App. 92, 95, 74 P.3d 672 (2003).
¶ 30 Remanded for proceedings consistent with this opinion.
WE CONCUR: SCHINDLER, A.C.J., and GROSSE, J.
NOTES
[1] There were two trials in this case. At the second, Aden could not recall whether Elmi threatened her during the argument. She also could not recall whether Elmi called and argued with her a second time prior to the shooting. She conceded, however, that she testified to receiving such a call in Elmi's first trial. The testimony from the first trial was admitted solely for purposes of assessing Aden's credibility.
[2] Although Elmi did not object to the transferred intent instruction at the second trial, the State does not contest his claim that the issue is one of constitutional magnitude that can be raised for the first time on appeal.
[3] There was no battery in this case; therefore, only the attempted battery and reasonable apprehension of harm forms of assault are at issue.
[4] It is technically incorrect to say that the statute "transfers" intent; rather, the statute simply allows prosecution for intended and unintended victims. For simplicity's sake, we refer to the statutory mechanism as a statutory "transfer" of intent.
[5] The authorities Elmi cites merely hold that the attempted battery and reasonable apprehension forms of assault require specific intent; they do not hold that the specific intent must match a specific victim. See State v. Byrd, 125 Wash.2d 707, 887 P.2d 396 (1995); State v. Daniels, 87 Wash.App. 149, 940 P.2d 690 (1997); State v. Austin, 59 Wash.App. 186, 796 P.2d 746 (1990).
[6] Elmi's concern regarding limitless liability overlooks the fact that courts can restrict the reach of transferred intent by limiting unintended victims to those in a zone of danger or confined space, such as a car or home.
[7] Given our conclusion and given the State Supreme Court's recent decision that the common law forms of assault are not alternative means of committing statutory assault, State v. Smith, ___ Wash.2d ___, 154 P.3d 873 (2007), Elmi's unanimity argument fails.