# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59756-0-II |
| Respondent, | |
| v. | |
| ALEXANDER SEMAJ ISAIAH CARSON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—In March 2023, Alexander Carson saw his acquaintance Treyvon Clark in the parking lot of a smoke shop. Carson ordered the driver of the car he was in to pull over and park. Carson pulled out a gun and placed it on his lap. After Clark left the smoke shop and started driving home, Carson directed the driver to drive to Clark's house. While Clark was walking from his car to his house, Carson shot an automatic weapon in Clark's direction from the passenger seat of the car he was in, firing 19 bullets and hitting Clark once in the forehead. Clark had severe injuries but survived.

A jury convicted Carson of several crimes, including attempted first degree murder. When calculating Carson's offender score, the trial court included felony convictions from when Carson was a juvenile.

On appeal, Carson argues that the State failed to present sufficient evidence that he acted with premeditated intent to kill Clark, which is required to convict for attempted first degree murder. Carson contends that, on its own, shooting a firearm 19 times in one burst does not demonstrate intent to kill, and that the State failed to present other evidence of premeditation.

Carson also argues that at his sentencing, the trial court should have applied a statutory amendment that prohibits courts from including most juvenile offenses in offender score calculations.

We hold that there was sufficient evidence that Carson acted with premeditated intent to kill Clark. We also conclude that the trial court did not err by including Carson's juvenile offenses in his offender score, as it properly complied with the sentencing requirements in effect when Carson's offenses were committed. Accordingly, we affirm.

FACTS

On March 25, 2023, Jeremy Vanzant-Volpe picked up Carson and another man from Carson's mother's apartment complex. Carson sat in the front passenger seat of Vanzant-Volpe's car.

Vanzant-Volpe then drove to a smoke shop. There, Carson saw Clark, whom he recognized. The record demonstrates that Clark and Carson knew each other when they were younger and that Carson knew where Clark lived. The record also suggests that at some point they stopped spending time together.

Clark went through the drive-through window at the smoke shop. Vanzant-Volpe's car started to go toward the drive-through window, then reversed and parked. Surveillance video from the smoke shop shows both Vanzant-Volpe and Carson wearing balaclavas covering their faces. The car eventually left the smoke shop area.

After leaving the smoke shop, Vanzant-Volpe drove to Clark's house. At about 4:55 p.m., Clark parked his car across the street and started walking toward his house. As he was walking, a passenger in Vanzant-Volpe's car fired several rounds from an automatic gun, and one bullet hit Clark in the forehead. A neighbor's surveillance video shows a light-colored area in the front

2

passenger's side of Vanzant-Volpe's car at this time, which could have been consistent with the light emitted from a firearm when it is fired.

Clark's mother and sister heard "rapid fire" gunshots and saw Clark on the ground, bleeding from his head. 1 Verbatim Rep. of Proc. (May 7, 2024) at 228. A neighbor also heard a burst of gunfire for about two or three seconds.

Clark's family called the police and Clark was transported to the hospital where he underwent several surgeries for a single gunshot wound to the forehead. Clark survived the shooting but had serious and lasting injuries and disabilities as a result.

Police found 19 firearm cartridge casings at the scene of Clark's shooting, and forensic testing revealed they were all fired from the same gun. However, police never found the gun that was used in Clark's shooting.

Vanzant-Volpe's car fled the scene of the shooting through a nearby alley. About five minutes after the shooting, Vanzant-Volpe's car arrived at the same apartment complex where he picked up Carson.

Three days later, police arrested Vanzant-Volpe and interviewed him.

Several weeks later, on July 3, 2023, police were at Carson's apartment complex and saw a car rapidly leaving the parking lot. Police pursued the car—which was stolen—in a high-speed chase for several miles before the car hit another vehicle and stopped. Carson exited the car and police chased him through a wooded area where they heard a single gunshot go off and later found a magazine for a handgun. Police eventually detained Carson and found a box of ammunition in the driver's seat of the car he was driving. When searching Carson's phone, police found what appeared to be a chat between Carson and another person about switches that turned semiautomatic handguns into fully automatic handguns.

3

The State charged Carson with attempting to elude a pursuing police vehicle, unlawful possession of a stolen vehicle, first degree unlawful possession of a firearm, drive-by shooting, first degree assault with a firearm enhancement, and first degree attempted murder with a firearm enhancement. Carson and Vanzant-Volpe were tried together as codefendants.

Vanzant-Volpe testified at trial. He said that as he pulled into the smoke shop, Carson handed him a balaclava, which he put on. Carson also put a balaclava over his own face.

Vanzant-Volpe further testified that as he was pulling into the drive-through for the smoke shop, Carson told him to back up and park the car. At this point, Carson pulled out a gun with an automatic switch and put it on his lap. Vanzant-Volpe testified that after this, he drove away from the smoke shop before Carson gave him directions to turn around. Carson initially told Vanzant-Volpe to follow Clark's car as it left the smoke shop, then directed him to Clark's house.

At some point while Vanzant-Volpe was driving, he heard rapid gunfire from next to him. He was directed to drive away, so he exited the street through an alley and dropped Carson and the other passenger off back at Carson's mother's apartment.

During closing arguments, Carson's defense counsel argued that the State did not present sufficient evidence of Carson's premeditated intent to kill Clark and claimed that Carson's actions demonstrated only the recklessness required for a drive-by shooting. Carson's defense counsel contended that the State's evidence did not prove that Carson had a motive to kill Clark nor that Carson shot the 19 rounds of gunfire specifically at Clark.

The jury found Carson guilty of all charged crimes, including attempted first degree murder.

The trial court held Carson's sentencing hearing on June 14, 2024. At the time of sentencing, Carson had been convicted of several prior crimes, most of which he committed as a

4

juvenile. The trial court included Carson's juvenile felony offenses when calculating his offender score, though Carson's defense counsel preserved an objection to the inclusion of these offenses. The trial court ultimately sentenced Carson to 608 months. Carson appeals his conviction and sentence.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Carson argues that the State presented insufficient evidence to prove that Carson acted with premeditated intent to kill Clark, which is a required element of attempted first degree murder. We disagree.

"The State bears the burden of proving all the elements of an offense beyond a reasonable doubt." *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). When reviewing a claim of insufficient evidence, this court asks whether, viewing all the evidence in the light most favorable to the State, a rational trier of fact could find that all of the crime's essential elements were proven beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). Under this standard, the defendant admits the truth of the State's evidence and all reasonable inferences that arise therefrom. *Id.* at 265-66. Both circumstantial and direct evidence are considered equally reliable. *Id.* at 266. "However, inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

A person commits attempted first degree murder when they have premeditated intent to cause the death of another person and take a substantial step toward causing that person's death. RCW 9A.32.030(1)(a); RCW 9A.28.020(1).

5

A.      Intent to Kill

First, Carson argues that the act of firing multiple gunshots in rapid succession is not sufficient to demonstrate premeditated intent to kill. Carson contends that a "wild, careless discharge of bullets in extremely rapid succession," only one of which hit Clark, does not, on its own, demonstrate that Carson intended to kill Clark. Br. of Appellant at 26. Carson argues that the evidence equally suggests that Carson's intent was to commit a drive-by shooting or scare Clark with gun shots. Carson further asserts that the State did not present evidence that he had a motive to kill Clark. And Carson claims that no other evidence indicated that Carson intended to kill Clark.

"The crime of attempted murder requires specific intent to cause the death of another person." *State v. Elmi*, 138 Wn. App. 306, 313, 156 P.3d 281 (2007) ,*aff'd*, 166 Wn.2d 209, 207 P.3d 439 (2009). "Intent is rarely provable by direct evidence." *State v. Gallo*, 20 Wn. App. 717, 729, 582 P.2d 558 (1978). Thus, a jury may infer intent to kill from the totality of the circumstances surrounding the event. *Elmi*, 138 Wn. App. at 313. "Proof that a defendant fired a weapon at a victim is a sufficient basis for finding an intent to kill." *Id.* (citing *State v. Hoffman*, 116 Wn.2d 51, 84-85, 804 P.2d 577 (1991)).

In *Elmi*, the defendant and his estranged wife had a heated argument over the phone. *Id.* at 311. Later that night, the defendant went to the house where the wife was located. *Id.* Looking out of the living room window, the wife saw the defendant arguing with people outside. *Id.* Seconds later, she heard gunshots piercing the window. *Id.* Police found four shell casings within 10 feet of the window, three bullet holes in the window, and bullet holes in the curtains, the television screen, and a kitchen cabinet. *Id.*

Division One held that when viewed in the light most favorable to the State, "the location and number of the bullet holes, the timing of the shots in relation to [the wife's] appearance at the

window, the proximity of the shell casings to the living room window, and the heated argument earlier in the day strongly support an inference of intent to kill." *Id.* at 314.

Here, Carson argues that there is insufficient evidence that he fired his weapon *at* Clark, so there is insufficient evidence that he intended to kill Clark. *See id.* at 313 ("Proof that a defendant fired a weapon at a victim is a sufficient basis for finding an intent to kill."). However, circumstantial evidence supports the conclusion that Carson had intent to kill Clark. Carson saw Clark at the smoke shop and initially directed Vanzant-Volpe to follow Clark's car. He then directed Vanzant-Volpe to Clark's house and only fired his gun in Clark's direction when Clark was out in the open walking from his car to his house. In this position, Clark was more likely to be hit by one of the 19 rounds that Carson fired from his automatic weapon. Unlike in *Elmi*, we do not know the exact location of each of the rounds that Clark shot, but we do know that at least some of the shots were aimed toward Clark because Clark was hit by one. Thus, the evidence that Carson intended to shoot at Clark is perhaps even stronger than in *Elmi*, where the victim was inside and was not hit by any bullets. 138 Wn. App. at 311.

Additionally, while the exact contours of Carson and Clark's relationship are not included in the record, there is evidence that they were once friendly but had a falling out such that Carson recognized Clark at the smoke shop, pulled out a gun, gave Vanzant-Volpe a balaclava, and directed him to follow Clark home. Viewing this evidence in the light most favorable to the State, it is sufficient to show that Carson intended to kill Clark, even if we are uncertain as to the details of his motive or reasons.

Accordingly, under the totality of the circumstances and viewing the evidence in the light most favorable to the State, the State presented sufficient evidence that Carson intended to kill Clark.

7

B.      Premeditation

Carson also argues that the State failed to provide sufficient evidence showing that he acted with premeditation. Carson argues that the presence of a weapon alone does not demonstrate premeditation, and there was no evidence that Carson took aim or deliberated before firing. Carson contends that the shooting was "a single, quick incident," demonstrating no time for premeditation. Br. of Appellant at 31. Carson claims that the State's evidence of premeditation was purely speculative.

To convict a defendant of attempted first degree murder, the State must prove that the defendant had premeditated intent to cause the death of another person and took a substantial step toward causing that person's death. RCW 9A.32.030(1)(a); RCW 9A.28.020(1). Premeditation requires "more than a moment in point of time." RCW 9A.32.020(1). The State must show "'the deliberate formation of and reflection upon the intent to take a human life'" with "'thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *State v. Hummel*, 196 Wn. App. 329, 354, 383 P.3d 592 (2016) (quoting *Hoffman*, 116 Wn.2d at 82-83). "The 'mere opportunity to deliberate is not sufficient to support a finding of premeditation.'" *Id.* (quoting *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)). The State may use circumstantial evidence to prove premeditation if the "inferences supporting premeditation are reasonable and the evidence is substantial." *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014).

Washington courts have noted four factors that are particularly relevant when assessing premeditation: method, procurement of a weapon, stealth, and motive. *State v. Castro DeJesus*, 7 Wn. App. 2d 849, 883, 436 P.3d 834 (2019). However, a "wide range" of other factors can also be

relevant and can "support an inference of premeditation." *State v. Aguilar*, 176 Wn. App. 264, 273, 308 P.3d 778 (2013) (citing *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999)). Thus, we consider the totality of the circumstances. *See State v. Ollens*, 107 Wn.2d 848, 855, 733 P.2d 984 (1987) (Callow, J., concurring in result) (describing the jury's evaluation of whether a killing was premeditated as "the evaluation of the totality of the evidence in the light of all of the surrounding circumstances").

Specifically in shooting cases, Washington courts have considered the transportation of a firearm to the scene, a defendant's use of stealth when approaching the victim, and the number of shots fired as relevant factors demonstrating premeditation. *See, e.g.*, *State v. Rehak*, 67 Wn. App. 157, 164, 834 P.2d 651 (1992) (finding sufficient evidence of premeditation where the defendant "crept up behind the victim who was sitting quietly in his chair and not in a confrontational stance" before shooting him several times); *Elmi*, 138 Wn. App. at 314 (finding sufficient evidence of premeditation in part because of the defendant's transportation of a firearm to the scene and the number of shots fired at the victim); *Hoffman*, 116 Wn.2d at 83-85 (finding sufficient evidence of premeditation where, among other factors, the defendants brought multiple weapons to the scene of the shooting, hid from the victims, and fired multiple shots at the victims).

Carson argues that the State did not present sufficient evidence of premeditation because there was no evidence that he took aim or deliberated immediately before firing his gun at Clark. However, Carson does not acknowledge the significant evidence of his actions before the shooting, starting at the smoke shop, that could reasonably show premeditation. In other words, Carson seems to contend that the *method* of the crime, shooting 19 continuous rounds from an automatic gun, alone does not demonstrate premeditation. However, courts consider the totality of the circumstances when assessing premeditation. *See Ollens*, 107 Wn.2d at 855.

9

While the presence of a weapon does not in itself prove premeditation, it can support an inference of premeditation. *Hoffman*, 116 Wn.2d at 83. Here, while it seems that Carson already had a gun on his person before he saw Clark at the smoke shop, he pulled out that weapon and set it on his lap after seeing Clark, several minutes before the shooting began. Carson then brought the weapon with him to the scene of the shooting, keeping it ready to use until Clark got out of his car. These facts support a finding of premeditation.

Evidence that the defendant attempted to hide himself from the victim prior to the attack also may be considered as evidence supporting an inference of premeditation. *State v. Barajas*, 143 Wn. App. 24, 36-37, 177 P.3d 106 (2007). When Carson saw Clark at the smoke shop's drive-through, he directed Vanzant-Volpe to pull away from the drive-through and pull over. At this point, Carson also handed Vanzant-Volpe a balaclava and donned one himself. Then, only after Clark left the smoke shop, Carson told Vanzant-Volpe to turn around towards Clark's car and directed Vanzant-Volpe to Clark's house. Thus, like the defendants in *Hoffman* and *Rehak*, Carson took several actions to avoid detection by Clark before the shooting. This evidence of stealth also points to premeditation.

Also, despite Carson's contentions, the method of the shooting reasonably demonstrated premeditation. Carson waited until Clark was walking unprotected to his house before the shooting. Additionally, the number of shots fired is a relevant consideration when assessing premeditation. *See, e.g.*, *Elmi*, 138 Wn. App. at 314. Carson argues his use of an automatic weapon shows recklessness and lack of premeditation, but we disagree that this was the only conclusion the jury could draw. Instead, it was a reasonable inference that Carson knew the use of an automatic weapon would substantially increase the chances that he would be able to hit Clark. Thus, Carson's

method of shooting 19 rounds continuously from an automatic weapon at Clark while Clark was unprotected indicates premeditation.

Carson cites *Hummel* to support his assertion that the State failed to demonstrate that he planned or deliberated before shooting at Clark. However, *Hummel* is distinguishable from this case. In *Hummel*, Division One held that even where evidence supported the conclusion that the defendant killed the victim, there was not sufficient evidence of premeditation because the State presented *no* evidence regarding the method of killing or whether the defendant deliberated or reflected before killing the victim. 196 Wn. App. at 354-58. In contrast, here, as described above, there is significant evidence demonstrating Carson's premeditation.

As a result, considering the totality of the circumstances, the State presented sufficient evidence that Carson acted with premeditated intent to kill Clark.

C.      Equal Protection

Embedded in his sufficiency of the evidence analysis, Carson contends that there are several different crimes, including drive-by shooting, that could be proved by the same act of firing multiple gunshots, so his conviction for attempted first degree murder violates equal protection principles.

However, "where two crimes require proof of different elements, they do not violate the right to equal protection of the laws." *State v. Armstrong*, 143 Wn. App. 333, 341, 178 P.3d 1048 (2008). This is because where crimes require proof of different elements, a prosecutor's discretion for charging different crimes from the same actions is appropriately "constrained by the different elements to be proved and the facts in each case." *Id.* at 342.

Here, unlike any of the other crimes Carson lists, attempted first degree murder requires premeditated intent to kill. *See* RCW 9A.32.030(1)(a); RCW 9A.28.020(1). Accordingly, because

attempted first degree murder requires a unique element, Carson's charge and conviction for attempted first degree murder do not violate equal protection.

## II. OFFENDER SCORE

Carson argues that the trial court erred by including Carson's juvenile offenses in the calculation of his offender score for sentencing.

Effective July 23, 2023, the legislature amended RCW 9.94A.525(1), thereby prohibiting trial courts from including a criminal defendant's juvenile convictions in their offender score except for the most serious crimes. LAWS OF 2023, ch. 415, § 2. Carson committed the offenses for which he was convicted in this case on March 25 and July 3, 2023, before the amendment regarding juvenile convictions and offender scores. However, Carson was sentenced on June 14, 2024, after the amendment's effective date.

Under RCW 9.94A.345, except as otherwise provided in the statutory scheme for criminal sentencing, "any sentence imposed under this chapter shall be determined in accordance with the law in effect when the current offense was committed." And RCW 10.01.040, the saving clause, states:

> Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, unless a contrary intention is expressly declared in the amendatory or repealing act, and every such amendatory or repealing statute shall be so construed as to save all criminal and penal proceedings, and proceedings to recover forfeitures, pending at the time of its enactment, unless a contrary intention is expressly declared therein.

Carson argues that because the RCW 9.94A.525(1)(b) amendment was in effect before his sentencing, the trial court should have excluded his juvenile convictions from his offender score. However, even where a criminal defendant was sentenced after a statutory amendment governing

sentencing, RCW 10.01.040 and RCW 9.94A.345 require that criminal sentences be determined by the law in effect *at the time of the offense*, and we are bound by these provisions. *State v. Jenks*, 197 Wn.2d 708, 715, 487 P.3d 482 (2021).

No language in the amendment to RCW 9.94A.525 expressly indicated that it would apply retroactively or avoid application of RCW 10.01.040 and RCW 9.94A.345. *See Jenks*, 197 Wn.2d at 720. Although Carson asserts that the legislative findings associated with the 2023 amendment to RCW 9.94A.525 establish retroactive intent, we have concluded that the legislature did not make its 2023 amendments to RCW 9.94A.525(1)(b) retroactive. *See State v. Solomon Gibson*, 33 Wn. App. 2d 618, 620, 563 P.3d 1079, *review denied*, 4 Wn.3d 1035 (2025); *State v. Boyce*, No. 40700-4-III, slip op. at 6 (Wash. Ct. App. Apr. 30, 2026)[1]; *State v. Troutman*, 30 Wn. App. 2d 592, 599-600, 546 P.3d 458, *review denied*, 3 Wn.3d 1016 (2024). We have also concluded that the remedial nature of a statute is irrelevant when it is subject to the saving clause statute. *State v. Tester*, 30 Wn. App. 2d 650, 658-59, 546 P.3d 94, *review denied*, 3 Wn.3d 1019 (2024). Accordingly, the trial court did not err by including Carson's juvenile convictions in his offender score.

CONCLUSION

We affirm.

---

[1] https://www.courts.wa.gov/opinions/pdf/407004_pub.pdf

No. 59756-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, J.

PRICE, A.C.J.