# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  55199-3-II |
| Respondent, | |
| v. | |
| CLARA MARJORIE ROOD, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Clara M. Rood appeals her convictions for attempted first degree murder, first degree assault, first degree robbery, first degree kidnapping, first degree burglary, second degree identity theft, and two counts of theft of a motor vehicle.  Rood argues that (1) the trial court abused its discretion in denying Rood's motion to suppress her statements confessing to the crimes, (2) the State presented insufficient evidence to convict Rood of attempted first degree murder, (3) the trial court violated Rood's right to effective counsel when it denied her motion for a continuance, (4) the prosecuting attorney committed misconduct, (5) the cumulative effect of repeated errors requires reversal of her convictions, (6) the trial court exceeded its statutory authority under RCW 9.94A.589(1)(b) when it scored both of Rood's serious violent offenses as a six, and (7) defense counsel provided ineffective assistance of counsel at sentencing when counsel failed to argue that Rood's two convictions for theft of a motor vehicle should count as the same criminal conduct.

We affirm Rood's convictions, but we reverse Rood's sentence and remand to the trial court for resentencing because the trial court exceeded its statutory authority under RCW 9.94A.589(1)(b) in its scoring of Rood's two serious violent offenses.[1]

## FACTS

### A. BACKGROUND

Beginning in November 2017, Rood lived with her stepfather, Robert Pullman, and her mother at Pullman's home. When Rood's mother passed away in 2018, Pullman moved into the basement of the home. The basement consisted of a bedroom, living area, pantry, and bathroom. Although Pullman ate his meals in the kitchen upstairs, he spent most of the time in the basement. Rood and her boyfriend, Jasper Phillips, shared a bedroom upstairs in Pullman's house. Pullman saw Rood and Phillips about once a day, and occasionally, the three ate meals together.

In March 2019, Rood and Phillips moved out of Pullman's home. Pullman was happy to see them go. He also feared that they might return, so he changed the locks in his home and installed a security system. Pullman always kept the doors to the upstairs of the home locked because he could not hear who came and went, but he usually did not lock the basement door where his bedroom was located.

### B. ATTACK OF PULLMAN AT HIS HOME

On August 14, Pullman, who was 72 years old at the time, went to bed and slept heavily. At approximately 3:00 a.m. on the morning of August 15, Pullman woke to blows landing on his head and other parts of his body. Pullman felt his scalp get cut as he got out of bed. Voices

---

[1] Because we remand for resentencing, we do not address the issue of whether the two convictions for theft of a motor vehicle should have been counted as the same criminal conduct.

shouted at him and demanded money. Pullman recognized the voices as those of Rood and Phillips. Pullman could not positively identify who was striking him; however, Pullman believed that Phillips and Rood took turns hitting him.

Eventually, the blows ceased, and Rood and Phillips duct-taped Pullman to his computer desk chair. Pullman heard Rood and Phillips running throughout the house. Rood and Phillips then wheeled Pullman into the bathroom and tied the door shut. Rood and Phillips checked on Pullman occasionally and added more tape. They also demanded that Pullman provide the personal identification number (PIN) to his debit card, telling him that they had his card. They told Pullman that if the PIN worked, they would call an ambulance, but if it did not, they would be back.

To Pullman, Rood appeared to be under the influence of a substance, but she did not appear afraid, and she had the presence of mind to change Pullman's email password. Rood also appeared to be in charge during the events that transpired at Pullman's home.

While locked in the bathroom, Pullman thought a vehicle may have pulled into his driveway and he yelled for help. Phillips came to the bathroom, pushed the chair over, stepped on Pullman's face, and told him to shut up. Pullman could hear that Rood and Phillips were in the home until 5:30 a.m.

Pullman routinely left the truck keys inside his trucks, and eventually, he heard Rood and Phillips starting the trucks in the garage. Rood and Phillips took the trucks and left. Once Rood and Phillips were gone, Pullman freed himself from the duct tape. He attempted to use his home telephone to call for help, but the wires were cut. Pullman dressed himself and walked to a neighbor's house for help. Pullman's neighbor called an ambulance.

3

Pullman was transported to the hospital for treatment. He sustained injuries to his hands, head, arms, and leg. He also suffered a subdural hematoma, which resulted from bleeding around the brain that caused direct pressure on the brain. The cuts caused by being repeatedly hit on the head resulted in Pullman having 30 staples on the top of his head.

Later that morning, Deputy Jeremy Koch of the Clark County Sheriff's Office saw Phillips driving Pullman's Ford Ranger pickup, and a chase ensued that ended in a crash. Law enforcement apprehended Phillips and Rood.

Pullman later discovered that Rood and Phillips had taken several folders from his filing cabinet that included important documents such as his passport and bank statements. Rood and Phillips also took Pullman's wallet, which contained his debit card and credit cards. The recorder that was attached to Pullman's security camera had its wires cut and was taken.

The State of Washington charged Rood with attempted murder in the first degree (Count I), assault in the first degree (Count II), robbery in the first degree (Count III), kidnapping in the first degree (Count IV), burglary in the first degree (Count V), identity theft in the second degree (Count VI), and two counts of theft of a motor vehicle (Counts VII and VIII). The State alleged that all crimes were committed against a family or household member. The State also alleged that, for all counts, Rood demonstrated or displayed an egregious lack of remorse. The State further alleged that Counts I-V were committed while Rood was armed with a deadly weapon.

C. ROOD'S STATEMENT TO LAW ENFORCEMENT

At the police station, Rood agreed to speak with Detective Jeremy Schultz. Detective Schultz escorted Rood from her holding cell to an interview room just a few feet away. Schultz advised Rood of her *Miranda*[2] rights, and Rood indicated that she understood.

During their conversation, Detective Schultz asked Rood where she and Phillips had obtained the vehicle they were driving. In response, Rood stated that she wanted an attorney. Detective Schultz confirmed with Rood that she wanted an attorney, and Rood stated that she did. Detective Schultz stopped asking questions and returned Rood to a holding cell after advising her of the charges against her. According to Rood, Detective Schultz then informed her that Phillips was trying to "pin" the events of August 15 on her. 1 Verbatim Report of Proceedings (VRP) (Feb. 27, 2020) at 29. Detective Schultz could not recall if he told Rood that Phillips was blaming her for what had transpired at Pullman's home. Detective Schultz stated, "It might be possible, but again, I can't recall if I said that or not." 1 VRP (Feb. 27, 2020) at 29.

Detective Schultz left Rood and returned to his office. An hour and twenty minutes after returning to his office, jail staff advised Detective Schultz that Rood was knocking on her cell door and wanted to speak with him.[3] Detective Schultz went to Rood's holding cell. Apparently, Rood had requested to speak with Detective Schultz and tell him what had happened. Detective Schultz reminded Rood that she had requested an attorney; however, Rood told Detective Schultz that she still wanted to speak with him. Rood also asked for a cup of coffee. Detective Schultz informed

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The parties agree that an hour and twenty minutes passed between the two interviews.

her that it would be a few minutes, and he closed the door. A short time later, once he secured the cup of coffee, he again made contact with Rood. Detective Schultz brought Rood back to the interview room, advised her the conversation was recorded, and read her the *Miranda* rights again. Rood signed a *Miranda* waiver form, stating that she understood her rights and still wanted to speak with Detective Schultz.

After signing the *Miranda* waiver, Rood stated that she and Phillips had gotten the car from Pullman's house. Rood provided a lengthy statement regarding her involvement in the events relating to Pullman that led to her arrest. Rood stated that both she and Phillips decided to go to Pullman's home to attempt to get his banking information. Once there, they attacked Pullman in his sleep, subdued him by binding him with tape, and searched the home for valuables. They obtained Pullman's PIN and eventually locked Pullman in the bathroom with a handmade device. At one point, after Rood disclosed details surrounding the event, Detective Schultz stepped out of the room, and then returned to continue the interrogation. After Rood gave her statement, Detective Schultz returned Rood to her cell.

During this second interview with Detective Schultz, Rood never requested an attorney, attempted to terminate the interview, or stated that she did not understand the questions. Rood gave appropriate responses and took part in a conversation with Detective Schultz regarding what had occurred.

D.     CrR 3.5 HEARING

Rood moved to suppress the statements made to Detective Schultz, asserting that Detective Schultz had used a ruse and coerced Rood to tell her version of events after she invoked her right

to counsel. Rood contended that after she invoked her right to counsel, Detective Schultz was prohibited from any further interrogation.

At the CrR 3.5 hearing, Detective Schultz testified that he could not recall if he had told Rood that Phillips was attempting to blame her for the attack on Pullman's home. He also testified that, after he returned Rood to her holding cell, he was in his office when jail staff informed him that Rood wanted to speak with him. When he again contacted Rood, he reminded Rood that she had requested an attorney, but Rood insisted on speaking with him. Detective Schultz advised Rood of her *Miranda* rights a second time, and Rood again acknowledged her rights. Rood signed a *Miranda* waiver form stating that she understood her rights. Rood then outlined what had occurred during the attack at Pullman's home, including her involvement. During this second interview, Rood never invoked her right to counsel. Rood also never stated that she did not want to proceed with her statement.

Rood testified at the hearing that Detective Schultz told her that Phillips was "pinning the whole thing" on her, and this weighed in her decision to speak with Detective Schultz without an attorney present. 1 VRP (Feb. 27, 2020) at 35. Rood also testified that "[she] felt that it was important that whatever [Phillips] said, that [her] side of the story was told as well." 1 VRP (Feb. 27, 2020) at 35. Rood acknowledged that she understood that she did not need to speak with Detective Schultz. Rood also understood that if she requested an attorney, the interview would stop.

Defense counsel argued:

I think that it's fine to [use a] ruse or to trick someone into making a confession. I don't think it's okay to [use a ]ruse or trick someone into waiving their Miranda

rights and that's what I'm saying happened here. Once those rights are invoked, the trickery and coercion and rusing has to stop and it didn't.

1 VRP (Feb. 27, 2020) at 41.

The trial court found that Rood did not immediately respond to Detective Schultz's statement. The trial court also found that Rood was subsequently advised again of her *Miranda* rights and decided to proceed nonetheless. The trial court denied the motion to suppress.

The trial court entered the following relevant written findings of fact:

3. The interview with the Defendant was video and audio recorded. At the beginning of the interview, Detective Schultz read Defendant his [sic] Miranda rights from his department issued Washington State Patrol card. Defendant said a little bit about the case. Then Defendant decided she did not want to speak and that she would like an attorney. Detective Shultz [sic] ended the interview at that time.

4. Hours later, Defendant then requested to speak with Detective Schultz, and Detective Schultz re-read her rights to her. Defendant stated she understood her rights and wished to waive them. Defendant then discussed the case at length. Her responses were appropriate, and she was not confused. She was not in handcuffs during the conversation and she knew she could stop the conversation and did not have to talk to the Detective.

5. Detective Schultz may have told Rood that the co-Defendant (Jasper Phillips) had blamed everything on her after Rood had invoked her rights to silence and to an attorney.

Clerk's Papers (CP) at 254.

The trial court also entered the following relevant conclusions of law:

2. Defendant knowingly, intelligently and voluntarily waiver [sic] her right to remain silent during the initial conversation about the car crash, and then invoked her rights to silence and to an attorney.

3. Then again during the second conversation the defendant knowingly, intelligently and voluntarily waived her right to remain silent. The First Statements after the Defendant invoked her rights are not admissible. The second statements after Defendant reengaged with the Detective and the

> Detective used a ruse saying the co-Defendant pinned it on her, did not overcome Defendant's ability to know whether her statements were voluntary. Defendant's motivation to make the statement does not make the statement involuntary. Defendant knowingly, intelligently and voluntarily waived her right to remain silent during the second interview and provided a statement thus the second statements are admissible at trial.

CP at 255.

E.      TRIAL

      1.      Testimony

During trial, Pullman testified that Rood appeared to be in charge during the events that transpired at his home. Pullman also testified that Rood did not appear afraid and she had the presence of mind to change his email password. Pullman further testified that both Phillips and Rood shouted at him and demanded money. Pullman believed that they both took turns hitting him. They demanded his PIN and told him that if it did not work they would return. Pullman was afraid that Rood and Phillips would return and light his house on fire, burning him inside. When Pullman freed himself and went to his neighbor's home, he told the neighbor that Rood's and Phillips' plan was to kill him, but Phillips changed his mind.

The State introduced evidence of a letter that Phillips attempted to pass to Rood while they were both in jail. In the note, Phillips wrote that he had not understood that Rood wanted Pullman to die. He wrote, "I truly do not remember you asking me to, I would have. I truly thought you wanted him to live." 2 VRP (Sept. 30, 2020) at 581.

Rood's defense at trial was that she acted under duress. Rood called Phillips, who testified that during a hike on August 14, he suggested to Rood that they should break into Pullman's home. He told Rood that they could get money to pay off the debts that he owed and for their rent. Rood

thought Phillips was joking. When Rood realized Phillips was serious, an argument ensued. Rood was furious at the idea. Rood started to run away, and Phillips pushed her to the ground to keep her from getting away. Phillips told Rood that if she refused to cooperate, he would harm her son. Phillips then cut Rood's arm and threatened her life. Only then did Rood agree.

Phillips testified that he struck Pullman with a "flat bar" and brass knuckles. 2 VRP (Sept. 30, 2020) at 648. He then tied Pullman to a chair. Meanwhile, Rood begged Phillips to not kill Pullman. Phillips took charge during the attack, telling Rood to get Pullman's PIN and to inform Pullman that if the PIN did not work, they would come back and burn down the house. Phillips wheeled Pullman into the bathroom and locked him in with a handmade mechanism.

Rood testified, and her testimony corroborated Phillips' testimony. Rood testified that she and Phillips were about to be evicted. Phillips told Rood that they were going to rob Pullman. Rood laughed because she not believe him. But Rood agreed to rob Pullman to protect her son.

2.      Recorded Phone Calls

On the third day of trial, Detective Schultz listened, for the first time, to recorded phone calls involving Phillips and Rood when each was in jail. In the first call, Phillips told a friend, Jennifer Lokken-Ore, that he planned to claim that he had forced Rood to participate in the home invasion against her will. He said, however, that this was not actually true. He asked Lokken-Ore to communicate this to Rood. In the second call, Lokken-Ore told Rood that Rood had been "taken hostage, do you understand." Ex. 133 at 3. Rood responded, "Recorded. Oh man, yeah I know. That's just—it was—it was awful." Ex. 133 at 3.

After Detective Schultz informed the prosecutor about the contents of the phone calls, the prosecuting attorney listened to the calls and sent them to defense counsel. The next day at trial,

10

the State sought to introduce the phone calls to demonstrate that Rood's duress defense was

fabricated. The State explained:

> I interviewed Ms. Lokken-Orr [sic] on Friday. She indicated that she had talked to Mr. Phillips from the jail multiple times. She said that they had talked about the duress offense, that he put Ms. Rood up to it. Thinking that that would just corroborate what Mr. Phillips was going to say anyway, I had it in the back of my mind, but didn't listen to the jail calls and then this week, as the case progressed, Detective Schultz heard the opening statement from the defense and also saw some notes of potentially [sic] testimony from defense witnesses. Detective Schultz, during the Covid break yesterday, had some time, went and listened to the jail calls . . . .
>
> So, having these jail calls, obtaining these jail calls yesterday, listening to them yesterday, I sent them to [Defense Counsel]. My plan is to play these in our case in chief, not for the truth of the matter asserted to show who was putting whom under duress, we don't think that's relevant. We don't need to prove our case showing who was under duress, we want to show that they were trying to match their stories, trying to come up with a version to try to get Ms. Rood off. . . . [I]f [Defense Counsel] maybe follows up with his own witnesses more carefully, he should've been able to discover this, so it's not the State's fault that the defense witnesses are lying and attempting to commit perjury, that's not a discovery violation, so I would ask to be able to play these recordings in our case in chief.

1 VRP (Sept. 30, 2020) at 497-99. The State also moved to amend the information and add the

additional charge of conspiracy to commit perjury.

Rood moved to exclude the phone calls because the calls were not provided until mid-trial,

and therefore, the trial court should exclude the phone calls and deny the State's motion to add an

additional charge of conspiracy. Specifically, Rood argued that admission of the jail phone calls

violated the rules of discovery as the evidence was not previously turned over to the defense. Rood

also argued that the phone calls could come in for purposes of impeachment; however, "[c]oming

in as substantive evidence is unfair midtrial." 2 VRP (Sept. 29, 2020) at 503. Rood contended

that defense counsel was not prepared to rebut introduction of the evidence to support a new charge

of conspiracy. Rood also contended that an opening statement had been made and jury voir dire completed, which rendered the late admission of the evidence unfair. The trial court ruled in favor of the State and permitted an amendment of the information to add conspiracy to commit perjury in the first degree (Count IX).

Rood moved to dismiss the newly added count of conspiracy to commit perjury on the basis of insufficient evidence, stating, "she's simply agreeing with the fact that she was put under duress and that's not her fault." 2 VRP (Sept. 29, 2020) at 509. The trial court denied the motion. Defense counsel then moved for a continuance. The trial court denied the motion without hearing further argument from either side and without further explanation.

The State then argued for the admission of the evidence in its case in chief. The State asserted that the evidence was relevant to show that Rood planned to conspire with Phillips to make a false defense. Rood responded that Phillips' statements were "all over the map." 2 VRP (Sept. 30, 2020) at 555. Rood argued that Phillips had previously informed Detective Schultz that Phillips made Rood participate in the attack. However, Phillips blamed Rood on phone calls with other family members. Rood also argued that "[i]t's not fair to her that statements by other people get used against her when she does nothing to further this conspiracy other than to agree with what it is . . . what they're saying happened is what she is saying happened and there's no evidence that she changed her story as a result of this phone call." 2 VRP (Sept. 30, 2020) at 555. Defense counsel then argued:

> Had I been given jail calls prior to trial, I would've requested all the jail calls. They are allegedly getting these jail calls for me, so I can have a full picture of what actually was talked about before and after these phone calls. So, that's a problem with not investigating your case fully prior to trial.

12

2 VRP (Sept. 30, 2020) at 555-56. The trial court admitted the recorded phone calls.

The State played the recordings of the phone calls to the jury later that day. The State

relied on the phone calls to argue against Rood's duress defense.

    3.      Prosecutor's Statements

        a.      Statements regarding kindness and brutality

In the State's opening statement, the prosecuting attorney explained that in the time

leading up to the attack at Pullman's home, Pullman had assisted Rood:

> There was some animosity between the defendant and Mr. Pullman about inheritances and the Will and things like that, but again nothing major and they essentially went their separate ways and then in the spring of 2019,[4] Mr. Pullman decided to let the defendant to [sic] live with him again. He has a house on Deepwood Lane, by the Skamania store, he built that house himself, he's lived in that house for a number [of] years and Ms. Rood had lived their [sic] previously. So, he decided he was going to let the defendant live with him, he's gonna let her get back upon her feet.
>
>     . . . .
>
>     . . . So, then in spring of 2019, he essentially decided he didn't want Ms. Rood and Mr. Phillips living in his house any longer. He asked them to move out. He also didn't charge them rent in the last couple of months, so they'd have money to be able to move out.
>
>     . . . .
>
>     He also even made a flyer to help them get housing, so that they could find another place to live. He wanted them out, but he was still willing to help Ms. Rood get a place.

1 VRP (Sept. 28, 2020) at 242-43. Rood objected to the first two of these statements. Rood did

not object to the last statement.

---

[4] Pullman testified that in 2017 Rood began living with him.

During the State's opening statement, the prosecutor also emphasized the "brutal" nature

of the facts:

> Ladies [a]nd gentlemen, this case brutal. There's no other way to say it, no other way to describe it, absolutely brutal. This is about the type of case you'd hear about in the news or see on TV or see in a movie, unfortunately this case happened to one of our citizens in Stevenson, it happened to one of our citizens who worked at the hardware store we all knew, who'd been in this town a long time. It happened when the defendant walked into Robert Pullman's house at three a.m., and hit [Pullman] in the head with a crowbar, beat him repeatedly, tied him up and left him to die, causing numerous injuries all about his head, face and body, causing a brain injury, left him to die.

1 VRP (Sept. 28, 2020) at 241. In closing argument, the prosecutor again characterized the case

as brutal, stating:

> As I told you in what seems like a long time ago, this case is brutal. . . . I'd ask you to go back and remember how you felt when Mr. Pullman testified, when he sat upon the stand and described these horrible acts. . . . I want you to think how he ended up in that chair, I want you to think and have that visceral image in your mind, Mr. Pullman tied up in that chair, blood all over his face and the defendant thinking it was 50/50 whether he died or not. I want you to think about that. Can you think about that scenario, her telling a family member of a friend about what you heard? That's something you'll hear in a movie, that's something you'll hear on TV, there's really only a word for it, torture. Tying someone up in the chair after you beat them over the head, that's torture, that's torturing someone. Very clearly, these defendant's [sic], Mr. Phillips and the defendant, tortured Mr. Pullman and it's absolutely brutal . . . . I'm gonna go through [the jury instructions] fairly quickly here just to discuss them, but the highlight of this case, the thing I want you to remember the most is the brutal nature of the those [sic] acts.
>
> . . . .
>
> . . . I want you to think about Mr. Pullman being woken up in the middle of the night, being hit in the head with the tire iron or a crowbar, that first blow being struck on him, not even knowing what happened to him and the blood pouring down his face and that was just the beginning of what happened to him.

2 VRP (Oct. 1, 2020) at 854-56, 870. Rood did not object to any of these statements.

No. 55199-3-II

b. Statement that Rood committed a substantial step

The prosecuting attorney argued in closing arguments that Rood's conduct constituted a substantial step, stating:

Very clearly when you beat someone, tie them up, leave them in a small room, make a mechanism so they can't get out and you aren't sure if they're going to die or not, that's a substantial step toward committing murder *in the eyes of the law*.

2 VRP (Oct. 1, 2020) at 888 (emphasis added). Rood objected to the statement, which the trial court overruled.

F. VERDICT

The jury found Rood guilty of attempted murder in the first degree (Count I), assault in the first degree (Count II), robbery in the first degree (Count III), kidnapping in the first degree (Count IV), burglary in the first degree (Count V), identity theft in the second degree (Count VI), and two counts of theft of a motor vehicle (Counts VII and VIII). The jury found Rood not guilty of conspiracy to commit perjury (Count IX). The jury also found that Rood was armed with a deadly weapon for Counts I-V. The jury further found that Rood committed counts I-VIII against a family or household member. Finally, the jury found that Rood demonstrated or displayed an egregious lack of remorse on Counts I-VIII. Relevant to Count II, assault in the first degree, the jury found that Rood used force or means likely to result in death, but the jury found that Rood had not intended to kill Pullman.

G. SENTENCING

In its sentencing memorandum, the State argued that the crimes of attempted first degree murder and kidnapping in the first degree constituted the same criminal conduct, and assault in the

15

first degree and robbery in the first degree constituted the same criminal conduct. The State contended that the remaining counts constituted separate conduct. Rood agreed.

The sentencing court assigned an offender score of 6 to Rood's assault in the first degree conviction and attempted murder in the first degree conviction.

Rood appeals.

## ANALYSIS

A.   MOTION TO SUPPRESS SECOND INTERVIEW WITH DETECTIVE SCHULTZ

Rood argues that her confession, made during her second interview with Detective Schultz, should be suppressed as the statements occurred after Detective Schultz improperly continued interrogation after she unequivocally invoked her right to counsel. Rood contends that the waiver of her *Miranda* rights resulted as a direct result of coercion and deception. We disagree.

1.   Standard of Review

Findings of fact entered after a CrR 3.5 hearing are verities on appeal if the defendant fails to challenge them. *State v. Lorenz*, 152 Wn.2d 22, 30, 93 P.3d 133 (2004). If challenged, we evaluate whether they are supported by substantial evidence. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We conduct a de novo review when considering whether the trial court's conclusions of law are supported by the findings of fact. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

A suspect has a Fifth Amendment right to counsel during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981); *State v. Templeton*, 148 Wn.2d 193, 208, 59 P.3d 632 (2002). Before custodial interrogation takes place, a suspect must be informed of, among other things, the right to silence and the right to an attorney. *Miranda*, 384

16

U.S. at 479; *State v. Mayer*, 184 Wn.2d 548, 557, 362 P.3d 745 (2015). Waiver of the right to counsel must be "voluntarily, knowingly and intelligently." *Mayer*, 184 Wn.2d at 557 (italics omitted) (quoting *Miranda*, 384 U.S. at 444).

> To be admissible . . . [an] admission . . . must pass two tests of voluntariness: (1) the due process test, whether the statement was the product of police coercion; and (2) the *Miranda* test, whether a defendant who has been informed of his rights thereafter knowingly and intelligently waived those rights before making a statement.

*State v. Reuben*, 62 Wn. App. 620, 624, 814 P.2d 1177, *review denied*, 118 Wn.2d 1006 (1991). "'Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" *Mayer*, 184 Wn.2d at 556 (internal quotations marks omitted) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

"The test of voluntariness for due process purposes is 'whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth.'" *Reuben*, 62 Wn. App. at 624 (quoting *State v. Vannoy*, 25 Wn. App. 464, 467, 610 P.2d 380 (1980)). "The test of voluntariness for *Miranda* purposes places upon the prosecution the heavy burden of establishing [the defendant] was fully advised of [their] rights, understood them, and knowingly and intelligently waived them." *Id.* at 625. A determination by the trial court that the statements were voluntary will not be overturned provided substantial evidence supports a finding of voluntariness by a preponderance of the evidence. *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007); *Reuben*, 62 Wn. App. at 624.

17

Once a suspect invokes a right to silence, it is impermissible for an officer to "spark an incriminating response from a suspect" by telling the suspect that an alleged accomplice has already confessed to the crime. *Nelson v. Fulcomer*, 911 F.2d 928, 934 (3d Cir. 1990). When a defendant claims that an interrogating officer's coercion deprived them of the ability to make a voluntary waiver, the question is whether the officer's tactics overcame the defendant's ability to make a rational decision. *State v. Unga*, 165 Wn.2d 95, 101-02, 196 P.3d 645 (2008). "'[S]o long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.'" *Id.* at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3rd Cir.), *cert. denied*, 479 U.S. 989 (1986)).

2. Knowing, Intelligent, and Voluntary Waiver

Rood challenges finding of fact 4, which provides:

> Hours later, Defendant then requested to speak with Detective Schultz, and Detective Schultz re-read her rights to her. Defendant stated she understood her rights and wished to waive them. Defendant then discussed the case at length. Her responses were appropriate, and she was not confused. She was not in handcuffs during the conversation and she knew she could stop the conversation and did not have to talk to the Detective.

CP at 254.

Here, substantial evidence supports the trial court's finding of fact 4. Detective Schultz testified that Rood reinitiated contact with him. Detective Schultz reminded Rood that she had requested an attorney, and she maintained that she wanted to speak with him. Detective Schultz advised Rood of her *Miranda* rights a second time. She acknowledged her rights. Rood signed the *Miranda* waiver form stating that she understood her rights after Detective Schultz went over the form with her. She then outlined what had occurred during the attack at Pullman's home,

18

including her involvement. During this second interview, Rood did not again invoke her right to

counsel. And Rood never indicated that she did not want to proceed with her statement.

And finding of fact 4 supports conclusion of law 3, in which the trial court found that in

this second conversation, Rood "knowingly, intelligently and voluntarily" waived her *Miranda*

rights:

> Then again during the second conversation the defendant knowingly, intelligently
> and voluntarily waived her right to remain silent. The First Statements after the
> Defendant invoked her rights are not admissible. The second statements after
> Defendant reengaged with the Detective and the Detective used a ruse saying the
> co-Defendant pinned it on her, did not overcome Defendant's ability to know
> whether her statements were voluntary. Defendant's motivation to make the
> statement does not make the statement involuntary. Defendant knowingly,
> intelligently and voluntarily waived her right to remain silent during the second
> interview and provided a statement thus the second statements are admissible at
> trial.

CP at 255. Contrary to Rood's assertion, the record and trial court findings support the trial court's

conclusion that Rood's statements were made knowingly, intelligently and voluntarily.

Notwithstanding the above, Rood argues that Detective Schultz engaged in deception and

coercion by using a ruse to improperly continue the interrogation;[5] thus, Rood's *Miranda* rights

were violated, rendering her confession inadmissible. To support her argument, Rood relies on

case law that states all interrogation must cease until counsel is present once a suspect invokes a

---

[5] We note that the trial court merely found "Detective Schultz *may have* told Rood that the co-Defendant (Jasper Phillips) had blamed everything on her." CP at 254 (emphasis added). The trial court did not make any affirmative finding that Detective Schultz told Rood that Phillips blamed everything on her. Rood fails to challenge the trial court's finding. Thus, it is a verity on appeal. *See Armenta*, 134 Wn.2d at 9.

right to counsel.[6]   However, an exception to the requirement that law enforcement may not interrogate a suspect after the suspect has asked for counsel is if "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485; *State v. Stewart*, 113 Wn.2d 462, 466, 780 P.2d 844 (1989), *cert. denied*, 494 U.S. 1020 (1990); *State v. Copeland*, 89 Wn. App. 492, 500, 949 P.2d 458 (1998).

To determine whether any statement Detective Schultz may have made that Phillips blamed Rood for everything overcame Rood's ability to make a rational decision about her right to remain silent, we look to the totality of the circumstances. *Unga*, 165 Wn.2d at 101-02.  Here, the totality of the circumstances show that even if Detective Schultz told Rood that Phillips was "pinning the whole thing" on her, that statement did not overcome Rood's ability to make a rational decision. 1 VRP (Feb. 27, 2020) at 35.

The parties do not dispute that Rood invoked her right to counsel and, therefore, all interrogation should have ceased.  The parties also do not dispute that Detective Schultz's alleged statement did not result in an immediate response by Rood.  Instead, even if Detective Schultz told Rood that Phillips had blamed everything on her, he then left Rood alone in her cell and returned to his office.  And it was Rood who reinitiated contact with Detective Schultz an hour and twenty minutes after Detective Schultz allegedly made the statement, had taken her back to her holding cell, went back to his own office, and had no further contact with her.

---

[6]  In her brief, Rood cites to *Edwards*.  451 U.S. at 484-85.  Several Washington cases stand for the same proposition.  *See, e.g.*, *State v. Piatnitsky*, 180 Wn.2d 407, 412, 325 P.3d 167 (2014), *cert. denied*, 574 U.S. 1081 (2015)); *State v. Copeland*, 89 Wn. App. 492, 500, 949 P.2d 458 (1998); *State v. Mason*, 31 Wn. App. 41, 44, 639 P.2d 800, *review denied*, 97 Wn.2d 1010 (1982).

After Rood reinitiated contact, Detective Schultz read to Rood her *Miranda* rights for a second time. Detective Schultz then went over the *Miranda* waiver form with Rood, who signed the form waiving her *Miranda* rights. Rood stated that she understood her rights and wished to waive them. Rood testified that she knew she could stop the second interview at any time by saying she wanted a lawyer. Further, Rood knew that she did not have to speak with Detective Schultz. Rood gave appropriate responses and was not confused during the second interview. The totality of the circumstances does not support Rood's argument that her confession resulted from coercion. Instead, the record shows that Rood was left alone in her cell, and Detective Schultz returned to his office. It was Rood who reinitiated contact and asked for a cup of coffee. Detective Schultz again left Rood alone. Only after he secured the cup of coffee did he engage with Rood. Given the sequence of events, Rood had time to make a rational decision to reinitiate contact with Detective Schultz after balancing the competing considerations of remaining silent or telling her side of the story. Thus, based on the specific facts of this case, Rood's argument fails.

B.      SUFFICIENCY OF THE EVIDENCE—ATTEMPTED FIRST DEGREE MURDER

1.      Legal Principles

The State must prove each element of a crime charged beyond a reasonable doubt. *State v. Brockob*, 159 Wn.2d 311, 336, 150 P.3d 59 (2006). When a defendant challenges the sufficiency of the evidence, we ask "'whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Vasquez*, 178 Wn.2d 1, 6, 309 P.3d 318 (2013) (quoting *State v. Bencivenga*, 137 Wn.2d 703, 706, 974 P.2d 832 (1999)). "'When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in

favor of the State and interpreted most strongly against the defendant.'" *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *Id.* at 551 (quoting *Salinas*, 119 Wn.2d at 201). "'Circumstantial evidence and direct evidence are equally reliable in determining the sufficiency of the evidence.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019), *cert. denied*, 140 S. Ct. 834 (2020) (internal quotations marks omitted) (quoting *Kintz*, 169 Wn.2d at 551). "However, inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *Vasquez*, 178 Wn.2d at 16. A claim of insufficiency of the evidence is reviewed de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014).

Here, the trial court instructed the jury that to find Rood guilty of attempted murder in the first degree, the State must prove the following elements beyond a reasonable doubt:

> (1) That on or about August 15, 2019, the defendant did an act that was a substantial step toward the commission of murder in the first degree;
> (2) That the act was done with intent to commit murder in the first degree; and
> (3) That the act occurred in the State of Washington.

CP at 86. Rood challenges only the intent element of her conviction.

Attempted first-degree murder requires that the defendant acted with premeditated intent to cause the death of another person. *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 540, 167 P.3d 1106 (2007), *cert. denied*, 552 U.S. 1154 (2008). "Premeditation is 'the deliberate formation of and reflection upon the intent to take a human life.' . . . [and] can be inferred from circumstantial evidence, including evidence of motive, procurement of a weapon, stealth, and the method of killing." *State v. Elmi*, 138 Wn. App. 306, 314, 156 P.3d 281 (2007) (quoting *State v. Robtoy*, 98

Wn.2d 30, 43, 653 P.2d 284 (1982), *abrogated on other grounds by Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)) *aff'd*, 166 Wn.2d 209 (2009); *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996).

"When intent is an element of the crime, 'intent to commit a crime may be inferred if the defendant's conduct and surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability.'" *Vasquez*, 178 Wn.2d at 8 (quoting *State v. Woods*, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)). We do not infer criminal intent from evidence that is "patently equivocal." *Id.* at 14. "Rather, inferences of intent may be drawn only 'from conduct that plainly indicates such intent as a matter of logical probability.'" *Id.* (quoting *State v. Bergeron*, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985)). For example, if the facts and circumstances fail to provide any clarity as to the defendant's intent, then the evidence is "patently equivocal." *Id.* at 14-16. Also, intent cannot be inferred when the alleged intent is based on a future contingency. *See id.* at 16.

2.    Sufficient Evidence of Premeditated Intent to Kill

Rood argues that the State failed to provide sufficient evidence of attempted first degree murder because the evidence presented on the premeditated intent to kill element was patently equivocal. Specifically, Rood contends that "[a]t most, the [S]tate's evidence demonstrated that [Rood] had 'contingent' intent to kill Mr. Pullman *if* his PIN number did not work. That evidence is 'patently equivocal' on the issue of intent." Br. of Appellant at 37 (emphasis in original). We disagree.

Here, viewing the facts in the light most favorable to the State, there is sufficient circumstantial evidence showing that Rood acted with premeditated intent in attempting to kill Pullman. The evidence presented at trial showed that Rood and Phillips had an agreement to get

money from Pullman, who was 72 years old. In executing their agreed plan, Rood and Phillips stealthily entered Pullman's house through a back door at approximately 3:00 a.m. The lights in the house were off, and Pullman was asleep. Rood and Phillips brought a prybar or crowbar and brass knuckles with them to the scene of the crime. They repeatedly struck Pullman's head while he was sleeping. They also struck Pullman repeatedly on his arms and legs. Rood acknowledged that the cuts on Pullman "were so deep and there was so much blood" and that Pullman "was really badly hurt." 2 VRP (Oct. 1, 2020) at 754. As a result of being repeatedly hit on the head, Pullman suffered a subdural hematoma and required 30 staples for the cuts on his head. And despite acknowledging that Pullman was "really badly hurt," Rood did not seek medical attention for Pullman. Instead, Rood and Phillips tied Pullman to a chair with duct tape, rolled him into the bathroom, and tied the door shut. Rood and Phillips also prevented Pullman from immediately obtaining help by severing the home's phone line. And when Pullman freed himself, he went to a neighbor's home for help and told the neighbor that Phillips' and Rood's plan was to kill him, but Phillips changed his mind. Further, Phillips wrote a note from jail stating that he had not understood that Rood wanted Pullman to die. Evidence of Rood's intent based on her conduct and the facts and circumstances of the attack on Pullman is not "patently equivocal." Instead, the evidence is sufficient for any rational trier of fact to find that Rood acted with premeditated intent; therefore, Rood's sufficiency of the evidence challenge fails.

C.    MOTION TO CONTINUE TRIAL

Rood argues that the trial court abused its discretion by denying a continuance after admitting mid-trial evidence of the jail phone calls involving Rood and Phillips that was put forth by the State to rebut her claim of duress. She contends that defense counsel required the

24

continuance in order to investigate and prepare to rebut the new evidence. She emphasizes that she presented a duress defense as to seven of the eight charges against her.

The decision to grant or deny a continuance is reviewed under an abuse of discretion standard. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004); *State v. Castillo-Lopez*, 192 Wn. App. 741, 746, 370 P.3d 589, *review denied*, 185 Wn.2d 1038 (2016). We will not reverse a trial court's decision unless the appellant shows that the trial court's decision was manifestly unreasonable, exercised on untenable grounds or for untenable reasons. *Downing*, 151 Wn.2d at 272. "In exercising discretion to grant or deny a continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." *Id.* at 273. "Whether the denial of a continuance rises to the level of a constitutional violation requires a case-by-case inquiry." *Id.* at 275. "The decision to deny the defendant a continuance will be disturbed on appeal only upon a showing that the defendant was prejudiced or that the result of the trial would likely have been different had the motion been granted." *State v. Kelly*, 32 Wn. App. 112, 114, 645 P.2d 1146, *review denied*, 97 Wn.2d 1037 (1982); *State v. Eller*, 84 Wn.2d 90, 95, 524 P.2d 242 (1974).

Rood cites *Ramsey v. Dep't of Soc. & Health Servs.*, 134 Wn. App. 573, 586, 141 P.3d 85 (2006),[7] for the proposition that "a trial court violates the right to counsel by denying a motion to continue when more time is needed in order for defense counsel to adequately investigate and prepare for trial." Br. of Appellant at 42. In *Ramsey*, the appellant, Amos Ramsey, was appointed counsel the day before termination proceedings. 134 Wn. App. at 579. On the day of trial,

---

[7] Rood references *Ramsey* as *In re V.R.R.* in her brief.

Ramsey's counsel explained to the trial court that he was not prepared for trial and could not provide effective representation without a continuance because he was newly appointed, had received no discovery, had spoken with no witnesses and had not received a witness list. *Id.* at 585-86. Counsel also informed the court that he believed the State would provide expert testimony, and he needed time to obtain an independent evaluation. *Id.* at 579. The trial court denied the continuance motion because Ramsey had known of the termination proceedings for months and had failed to obtain counsel. *Id.*[8]

On appeal, we reversed, holding that the decision to deny the motion to continue denied Ramsey the right to effective counsel and was an abuse of discretion. *Id.* at 586. We reasoned that it was undisputed that appointed counsel was not prepared to represent Ramsey. *Id.* at 585. Counsel had received no discovery and had no opportunity to review relevant documents, interview witnesses or obtain an independent evaluation of Ramsey. *Id.* On this basis, we held that counsel required more time to prepare in order to provide effective assistance of counsel. *Id.* at 586.

---

[8] Rood's other cited authorities are distinguishable from the facts of this case. All involve dismissal of criminal charges under CrR 8.3 and all involved egregious actions by the State that compromised the ability of the defense to prepare for trial. *See State v. Burri*, 87 Wn.2d 175, 550 P.2d 507 (1976) (the State's use of a special inquiry to gain evidence from defense witnesses of a crime already charged, which is contrary to the purpose of a special inquiry to investigate suspected crimes, interfered with defense counsel's ability to consult with his own witnesses prior to trial and denied the defendant's right to counsel); *State v. Martinez*, 121 Wn. App. 21, 35, 86 P.3d 1210 (2004) (State violated defendant's due process when it knew about exculpatory evidence but failed to provide the exculpatory evidence to the defense until just before the State rested its case in chief); *State v. Sherman*, 59 Wn. App. 763, 768-72, 801 P.2d 274 (1990) (case dismissed under CrR 8.3 due to the State's mismanagement of the case throughout the proceedings as evidenced by the State agreeing to but then failing to obtain and produce evidence in violation of a pretrial order, by filing an amended information eight days after the trial was to have commenced, failing to produce a separate witness list, and attempting to expand the witness list on the first day of trial).

Here, the prosecution obtained the phone calls on the third day of trial, and Detective

Schultz listened to jail house calls involving Phillips and Rood for the first time. Detective Schultz

decided to listen to the calls after hearing the opening statement of defense counsel and seeing

notes of potential testimony from defense witnesses. Detective Schultz then notified the State.

The State listened to the calls, immediately turned the calls over to the defense, and informed the

trial court and the defense that it intended to use them at trial that day to rebut Rood's duress

defense.

On appeal, Rood does not allege that the prosecutor's actions resulted in the late

introduction of the jail phone calls as she did below. Instead, Rood contends that defense counsel

was not prepared to rebut the introduction of the evidence to support the State's new conspiracy

charge. She contends that she needed more time to listen to the calls, discuss the evidence with

witnesses, and seek other evidence to impeach the state's theory that she had fabricated her

defense.

The record below does not show the trial court's reasoning for denying the continuance.

Nevertheless, immediately before ruling, the trial court considered Rood's argument that

admission of the evidence mid-trial as substantive evidence violated her right to a fair trial. Rood's

counsel contended that they were not prepared to rebut introduction of the evidence to support the

new charge of conspiracy. Rood argued that an opening statement had been made and jury voir

dire completed, which rendered the late admission of the evidence unfair. Specifically, defense

counsel argued:

> Had I been given jail calls prior to trial, I would've requested all the jail calls. They
> are allegedly getting these jail calls for me, so I can have a full picture of what

actually was talked about before and after these phone calls. So, that's a problem with not investigating your case fully prior to trial.

2 VRP (Sept. 30, 2020) at 555-56.

Here, the trial court noted that the State was permitted to continue to investigate the case. The trial court also noted that at its first opportunity, the State provided notice to defense counsel. The trial court acknowledged that the evidence would have an effect on Rood's duress claim, but noted that it was up to the jurors to determine if they believed Rood was involved in a conspiracy rather than acted under duress.

On appeal, Rood argues that she needed more time to discuss the evidence and listen to the calls. However, the record shows that Rood had nearly the same amount of time as the State to prepare before the jail phone calls were played for the jury. And the record indicates that Rood was previously aware of the jail phone calls with Lokken-Ore, a party to both phone calls, because Rood had intended to call Lokken-Ore as a witness. In an interview with the State, Lokken-Ore stated that she discussed the duress defense from the jail. An interview by the defense would have revealed the same information. Rood also participated in one of the two calls that the State sought to admit. Therefore, defense counsel had access to one of the key witnesses with whom he needed to discuss the calls—Rood. Because we will reverse a trial court's denial of a continuance only on a finding that the trial court's decision was manifestly unreasonable or based on untenable grounds or for untenable reasons, we decline to reverse the trial court.

Even assuming that the trial court erred in denying the motion to continue, Rood fails to show prejudice or that the result of the trial would likely have been different had the motion been granted. *Kelly*, 32 Wn. App. at 114. Much of the evidence in the record contradicted Rood's

duress claim. Pullman testified that he believed both Rood and Phillips struck him. Pullman also testified that Rood was in charge. The record shows that, before the phone call with Lokken-Ore, Rood told Detective Schultz that she had agreed to a plan with Phillips. She also told Detective Schultz that she hit Pullman with the crowbar. She further stated that she then held a flashlight in Pullman's eyes while Phillips struck him. Rood further admitted to tying up Pullman. And Rood never told Detective Schultz that she acted under duress. Further, the admission of the jail phone calls did not result in a conviction for the added charge—Rood was acquitted of the conspiracy to commit perjury charge. Because Rood fails to show that the result of the trial would have differed had the continuance been permitted, Rood's challenge fails.

D.      PROSECUTORIAL MISCONDUCT

Rood argues that the prosecuting attorney committed misconduct by (1) appealing to the jury's passion and prejudice when emphasizing Pullman's kindness toward Rood, emphasizing the brutality of the case before it, and asking the jury to place themselves in Pullman's shoes,[9] and (2) misstating the law to the jury when arguing that a substantial step had been taken "'in the eyes of the law.'" Br. of Appellant at 46 (boldface omitted).

1.      Legal Principles

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's

---

[9] We analyze arguments that the State improperly asked the jury to put themselves in the shoes of the victim "as appeals to the jury's passion and prejudice." *State v. Pierce*, 169 Wn. App. 533, 555-56 n.9, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012).

conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-61, 278 P.3d 653 (2012). A prosecutor's improper statements are prejudicial when there is a substantial likelihood that they affected the jury verdict. *Glasmann*, 175 Wn.2d at 704. When a defendant fails to object to improper argument below the error is waived unless it is shown "that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Id.*

During opening statements, comments "'should be confined to a brief statement of the issues of the case, an outline of the anticipated material evidence, and reasonable inferences to be drawn therefrom.'" *State v. Loughbom*, 196 Wn.2d 64, 76, 470 P.3d 499 (2020) (quoting *State v. Campbell*, 103 Wn.2d 1, 15-16, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985)). Although a prosecutor has wide latitude during closing argument to argue reasonable inferences from the evidence, "a prosecutor must 'seek convictions based only on probative evidence and sound reason.'" *Glasmann*, 175 Wn.2d at 704 (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74, *review denied*, 118 Wn.2d 1007 (1991)); *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Allegedly improper comments are reviewed in the context of the State's entire argument. *Fisher*, 165 Wn.2d at 747. Misconduct occurs when a prosecuting attorney deliberately appeals to a jury's passion and prejudice and encourages it to enter a verdict on that improper basis rather than the evidence before it. *Glasmann*, 175 Wn.2d at 711.

"A prosecuting attorney commits misconduct by misstating the law." *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). Also, arguments relying on evidence outside the record about what the defendant's thoughts were, inviting the jury to relive the horror of the crime by fabricating a "heart-wrenching" story about how the crimes occurred, and inviting the jury to imagine the crimes happening to them improperly appeals to the jury's passion and prejudice.

*State v. Pierce*, 169 Wn. App. 533, 555, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012).

And repeated inflammatory rhetoric made in opening statements and closing arguments that create

the prism for the jury to view the evidence is improper. *See Loughbom*, 196 Wn.2d at 76-77.

2.      Statements Appealing to Passion and Prejudice

Rood argues that the prosecuting attorney appealed to the jury's passion and prejudice by

emphasizing the kindness shown by Pullman to Rood and by emphasizing the brutal nature of the

facts of the case. We disagree.

a.      Kindness statements

Here, Rood challenges the statements by the prosecuting attorney in the State's opening

statement that emphasized kindness shown by Pullman to Rood. Specifically, the challenged

statements include:

> There was some animosity between the defendant and Mr. Pullman about inheritances and the Will and things like that, but again nothing major and they essentially went their separate ways and then in the spring of 2019, Mr. Pullman decided to let the defendant to [sic] live with him again. He has a house on Deepwood Lane, by the Skamania store, he built that house himself, he's lived in that house for a number [of] years and Ms. Rood had lived their [sic] previously. So, he decided he was going to let the defendant live with him, he's gonna let her get back upon her feet.
>
> . . . .
>
> . . . So, then in spring of 2019, he essentially decided he didn't want Ms. Rood and Mr. Phillips living in his house any longer. He asked them to move out. He also didn't charge them rent in the last couple of months, so they'd have money to be able to move out.
>
> . . . .
>
> He also even made a flyer to help them get housing, so that they could find another place to live. He wanted them out, but he was still willing to help Ms. Rood get a place.

1 VRP (Sept. 28, 2020) at 242-43. Rood objected to the first two statements, however, did not object to the third.

Rood does not contend that the fact that Pullman showed Rood kindness is unsupported by the record. Viewing the challenged statements in the context of the entire argument, the State argued evidence in the record, and State used the statements to provide context regarding the relationship between Rood and Pullman, explain why Pullman had permitted Rood to live at the home, and show why Rood was familiar with the home. In making these statements, the prosecuting attorney did not ask the jury to focus solely on Pullman's attitude toward Rood. Moreover, Rood does not explain how the first two statements had a substantial likelihood of affecting the jury verdict or how the final statement made resulted in prejudice that could not be cured by an instruction from the court. Because Rood fails to show that the statements were improper or prejudicial, we hold that the prosecutor did not commit misconduct.

b.      Brutal nature of the case statements

Next, Rood challenges statements made by the prosecuting attorney during the State's opening statement and closing argument that referenced the brutal nature of the case. Rood did not challenge these statements below.

Here, although the prosecuting attorney emphasized the brutality of the scene, the evidence supported that, in fact, a brutal crime had occurred. The evidence showed that Rood repeatedly beat 72-year-old Pullman on the head and body with a crowbar while he was sleeping, and Rood acknowledged that the scene was extremely bloody. The prosecuting attorney did not ask the jury to rely on fabricated stories or ask the jury to rely on argument outside the evidence. *Pierce*, 169

Wn. App. at 556. And the evidence in this case shows that although the State repeatedly used the word "brutal," the record does not show a verbatim repeating of inflammatory rhetoric that lacked any relevance to the case at hand. Moreover, a timely objection with an instruction from the court could have readily cured any alleged prejudice caused by the challenged statements. Rood's challenge fails.

> c. "Golden Rule" statements

Finally, Rood argues that the prosecuting attorney made an improper "golden rule"[10] argument during closing argument and asked the jury to imagine themselves in Pullman's shoes. We disagree.

In *Pierce*, the prosecuting attorney's arguments invited the jury to place themselves in the murder victims' shoes. 169 Wn. App. at 555. The State argued that "'[n]ever in their wildest dreams . . . or in their wildest nightmares'" did the victims expect to be murdered. *Id.* at 541. The prosecuting attorney also argued, "'never in your wildest nightmares would you imagine something like that happening to you, in your own home, the place where you grew up, where you raised kids, where you sent them to school, where you hoped to go ahead and play with your grandkids. Never did they imagine that. Never.'" *Id.*

Here, the prosecuting attorney's statements do not rise to the level of those made in *Pierce*. The prosecuting attorney asked the jury "to think about Mr. Pullman being woken up in the middle of the night, being hit in the head with the tire iron or a crowbar, that first blow being struck on him . . . and the blood pouring down his face." 2 VRP (Oct. 1, 2020) at 870. The State also asked

---

[10] "Golden rule" statements are statements that ask the jury to put themselves in the victim's shoes. *State v. Borboa*, 157 Wn.2d 108, 123 n.4, 135 P.3d 469 (2006).

the jury to "remember how you felt" during the testimony. 2 VRP (Oct. 1, 2020) at 854. As addressed above, the prosecuting attorney emphasized the brutal nature of the scene; however, the prosecuting attorney's argument was based on the evidence. Unlike the express appeal made by the prosecuting attorney in *Pierce*, the prosecuting attorney here did not ask the jury to imagine the crime happening to them. Because the prosecuting attorney emphasized facts that were in evidence and did not ask the jury to imagine themselves in the same position, Rood fails to show that the prosecuting attorney made an improper "golden rule" argument.

3.  Statement Regarding a Substantial Step "In the Eyes of the Law"

Rood also argues that the prosecuting attorney misstated the law during closing argument by informing the jury that it was predetermined as a matter of law that she had taken a substantial step toward the commission of attempted murder in the first degree. We disagree.

Here, the prosecuting attorney argued in closing argument that Rood's conduct constituted a substantial step, stating:

> Very clearly when you beat someone, tie them up, leave them in a small room, make a mechanism so they can't get out and you aren't sure if they're going to die or not, that's a substantial step toward committing murder *in the eyes of the law*.

2 VRP (Oct. 1, 2020) at 888 (emphasis added). The State recounted relevant evidence before the jury and argued that it showed that Rood had committed a substantial step. A prosecutor is permitted to draw reasonable inferences from the evidence and to state these inferences to the jury. *State v. Molina*, 16 Wn. App. 2d 908, 919, 485 P.3d 963, *review denied*, 198 Wn.2d 1008 (2021). Contrary to Rood's argument, the prosecuting attorney did not state that it was predetermined that a substantial step had been committed as a matter of law.

Further, Rood fails to show that the comment affected the jury verdict, and therefore, Rood fails to show prejudice. The jury instructions informed the jury of the elements of attempted murder in the first degree and also informed the jury of the definition of a substantial step. The instructions informed the jury that it must find that the evidence proved each element beyond a reasonable doubt to return a guilty verdict. We presume that the jury follows the trial court's instructions. *State v. Weaver*, 198 Wn.2d 459, 467, 496 P.3d 1183 (2021). The challenged conduct was not improper.[11]

E.      CUMULATIVE ERROR DOCTRINE

Rood argues that the cumulative effect of all errors raised on appeal deprived her of a fair trial. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. Because Rood fails to show that multiple errors deprived her of a fair trial, she is not entitled to reversal of her convictions based on the cumulative error doctrine.

F.      SENTENCING COURT'S AUTHORITY UNDER RCW 9.94A.589(1)(b)

Rood argues that the sentencing court exceeded its statutory authority when it sentenced Rood with an offender score of six for her serious violent convictions of assault in the first degree and attempted murder in the first degree. The State concedes that Rood's first degree assault

_____

[11] Rood also argues that cumulative prosecutorial error should result in reversal "Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006), *cert. denied*, 551 U.S. 1137 (2007). As discussed above, Rood shows only that the statements regarding brutality had the potential to affect the outcome of her trial. However, Rood fails to show that a curative instruction would not have cured any resulting prejudice. Because Rood fails to show multiple prosecutorial errors that would have had an effect on the outcome of the trial, she fails to show that the cumulative error doctrine should apply. *Id.* Therefore, her claim under the cumulative error doctrine fails. *Id.*

conviction, the crime with the lesser seriousness level, should have been scored as a zero. We agree with Rood and accept the State's concession.

RCW 9.94A.589(1)(b) provides:

Whenever a person is convicted of two or more serious violent offenses arising from separate and distinct criminal conduct, the standard sentence range for the offense with the highest seriousness level under RCW 9.94A.515 shall be determined using the offender's prior convictions and other current convictions that are not serious violent offenses in the offender score *and the standard sentence range for other serious violent offenses shall be determined by using an offender score of zero*.

(Emphasis added.) Under RCW 9.94A.589(1)(b), attempted first degree murder is a serious violent offense that carries a seriousness level of XV, the same seriousness level as completed first degree murder. *State v. Weatherwax*, 188 Wn.2d 139, 149-50, 392 P.3d 1054 (2017); RCW 9.94A.515; RCW 9.94A.030(46)(a)(i), (ix). First degree assault is a serious violent offence that has a seriousness level of XII. RCW 9.94A.515; RCW 9.94A.030(46)(a)(v).

Here, the sentencing court sentenced Rood with an offender score of six for each of these convictions. However, RCW 9.94A.589(1)(b) required the first degree assault conviction to be scored with an offender score of zero as it is has the lower seriousness level. Because the sentencing court exceeded its statutory authority under RCW 9.94A.589, we reverse Rood's sentence and remand for resentencing.

G.     INEFFECTIVE ASSISTANCE OF COUNSEL

Rood argues that she received ineffective assistance of counsel because defense counsel failed to inform the sentencing court that the two counts of theft of a motor vehicle should be scored together as one point as they constituted the same criminal conduct. Because we reverse

No. 55199-3-II

Rood's sentence and remand for resentencing based on the trial court exceeding its statutory authority as addressed above, we do not address this argument.

## CONCLUSION

We affirm Rood's convictions, reverse Rood's sentence, and remand for resentencing consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Veljacic, J.

Price, J.